*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0301P (6th Cir.)
File Name: 01a0301p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,
   *Plaintiff-Appellant,*

  *v.*

ROSALIND K. REED,
   *Defendant-Appellee.*

No. 00-1681

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 94-80095—Avern Cohn, District Judge.

Argued: August 9, 2001

Decided and Filed: August 31, 2001

Before: BOGGS, MOORE, and COLE, Circuit Judges.

---

### COUNSEL

**ARGUED:** David J. Debold, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellant. N.C. Deday LaRene, LaRENE & KRIGER, Detroit, Michigan, for Appellee. **ON BRIEF:** David J. Debold, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellant. N.C. Deday LaRene, LaRENE & KRIGER, Detroit, Michigan, Neil H. Fink, Birmingham, Michigan, for Appellee.

1

## OPINION

KAREN NELSON MOORE, Circuit Judge.    The government appeals the district court's twenty-two level downward departure in sentencing defendant-appellee Rosalind K. Reed, on remand from this court. *See United States v. Reed*, 167 F.3d 984, 994 (6th Cir.) (*Reed II*), *cert. denied*, 528 U.S. 897 (1999), (affirming Reed's conviction for money laundering but remanding for resentencing). Because we believe the district court abused its discretion by departing downward twenty-two levels, we **VACATE** the sentence imposed and **REMAND** for resentencing.

### I. JURISDICTION

We have jurisdiction to hear the government's appeal pursuant to 18 U.S.C. § 3742(b).

### II. BACKGROUND

The facts of Reed's offense and prosecution are set forth in our prior opinion, *see Reed II*, 167 F.3d at 986-87, and are supplemented here with facts from the record.  In January 1994, Reed, who was a criminal defense lawyer, was asked by her friend and neighbor Jerome Maddox to represent Richard Sumpter, who had just been arrested.  Sumpter was the supplier of a large marijuana distribution network from California to Michigan, and Maddox was one of Sumpter's drug distributors in Detroit.  Sumpter told Reed that he could not pay Reed her legal fees until Maddox paid off his drug debt to him, an amount which the two men estimated to be in excess of $400,000.    Reed then brokered Maddox's repayment by passing information between Maddox and Sumpter, who was incarcerated, and using her law offices as a drop-off and pick-up point for the money.  On two separate occasions, on February 11, 1994 and March 10, 1994, Maddox delivered payments in excess of $100,000 to Reed's office, where he was met by Diana Fitch, Sumpter's wife.  On

### IV. CONCLUSION

For the foregoing reasons, we **VACATE** the district court's sentence and **REMAND** for resentencing.  We direct the district court, on remand, to consider whether a downward departure is appropriate based solely on the contention that Reed's conduct was only incidental to the underlying criminal activity, and, if so, to depart downward from level 32 no more than four levels, resulting in a total offense level between 28 and 32.

124, 129 (2d Cir. 1992) (affirming district court's downward departure for single mother responsible for raising four young children).

In light of this and other circuits' reluctance to permit downward departures for single parents with young children, even for those who provide financial and emotional support for their children, and even when the children are likely to be placed in foster care pending their parent's incarceration, we do not believe that Reed has presented any evidence to demonstrate that her family circumstances are exceptional. Indeed, we conclude that Reed's family circumstances are similar to "the innumerable cases in which parents commit crimes and are sentenced under the Guidelines." *Sweeting*, 213 F.3d at 104. We agree with the government that, given the fact that Reed does not live with her sister's children nor does she financially support them, her responsibility for her nieces and nephews falls far short of that of a typical parent, much less a typical single parent. Also troubling is the fact that the district court did not address the government's contention that, prior to her criminal conviction, Reed spent one to several months in Jamaica every year. If Reed's family responsibilities permitted her to take extended vacations to Jamaica without the children every year, as it appears from the record, then we do not believe that her responsibility for her sister's children can be characterized as "exceptional," nor can her family circumstances be distinguished from the heartland of cases in which single parents convicted of a crime will be separated from their young children.

Because we do not believe the district court had any evidence before it that Reed's family circumstances justified a downward departure, we conclude that the district court abused its discretion by relying on this factor when sentencing Reed.

each date, Maddox and Fitch counted the money in Reed's office and paid Reed her legal fees in cash, $15,000 on the first visit, and $20,000 on the second. Joint Appendix ("J.A.") at 557-58. After Reed was paid, the remainder of the money was stored in a bag in Reed's office for Sumpter's drug courier to retrieve and transport to California, which he did on two subsequent dates.[1]

Sumpter and Maddox ultimately agreed to cooperate with government investigators. Their cooperation led to Reed's indictment on one count of conspiracy to distribute marijuana, along with thirty-one other co-defendants who were members of Sumpter's network, as well as two counts of money laundering and one count of conspiracy to commit money laundering. *See Reed II*, 167 F.3d at 987. After the district court refused to grant a proposed jury instruction stating that the act of delivering cash to a drug courier constituted a "financial transaction" for purposes of the money laundering statute, 18 U.S.C. § 1956,[2] the three money laundering counts in the indictment against Reed were dismissed. The government then filed an interlocutory appeal and the case was heard by this court en banc. In *United States v. Reed*, 77 F.3d 139, 142 (6th Cir.) (*en banc*) (*Reed I*), *cert. denied*, 517 U.S. 1246 (1996), we overruled two prior circuit cases and held that the delivery or transfer of cash to a drug courier, as alleged in the indictment, constituted a "financial transaction" under 18 U.S.C. § 1956(c)(4)(A)(i).

---

[1]The drug courier successfully delivered the first shipment of money to California; he was arrested in the San Francisco airport before delivering the second shipment of cash. *See Reed II*, 167 F.3d at 986.

[2]The statute states that "[w]hoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . with the intent to promote the carrying on of specified unlawful activity" shall be punished in accordance with the statute. 18 U.S.C. § 1956(a)(1)(A)(i). Conspiracy to violate this section is punishable under 18 U.S.C. § 1956(h).

Thereafter, Reed was re-indicted on four counts and tried in a two-month trial from September to November 1996. In December 1996, the jury found Reed guilty of conspiracy to launder money; the jury acquitted her of the drug conspiracy and one of the money laundering counts, and was unable to reach a verdict on the other money laundering count. J.A. at 62.

At sentencing, Judge Horace W. Gilmore relied upon the Presentence Report prepared by the probation office and calculated Reed's total offense level to be 32. The district court arrived at this number by starting with a base offense level of 23 pursuant to U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 2S1.1 (1995), the guideline applicable to convictions under 18 U.S.C. § 1956. The district court then added three levels, pursuant to § 2S1.1(b)(1), applicable when the defendant knows the funds are the proceeds of unlawful drug trafficking activity, two levels under § 2S1.1(b)(2) because the laundered funds exceeded $200,000, two levels under § 3B1.3 for abuse of a position of trust, and two levels for obstruction of justice, under § 3C1.1. Reed's criminal history category was determined to be level I. The district court then decided to depart downward from level 32 to level 23, thereby reducing Reed's sentence from a minimum of 121 months' imprisonment to 46 months. The district court gave two reasons for this departure: he stated that Reed's "conduct was on the outer edges" of conduct envisioned by 18 U.S.C. § 1956, and that she experienced a long delay and excessive costs in going to trial. J.A. at 421-22.

Reed appealed her conviction and the government cross-appealed her sentence. In *Reed II*, we affirmed Reed's conviction but vacated her sentence and remanded for resentencing. *See Reed II*, 167 F.3d at 994. We held that "[t]he district court's assertion that Reed's conduct was outside of the heartland of the offense specified in § 1956 is unsupported." *Id.* We reasoned that "[a]lthough holding Reed less culpable than the typical money launderer, the district court provided no specifics and offered no factors not

circumstance that should be reflected in sentencing"); *United States v. Brewer*, 899 F.2d 503, 508-09 (6th Cir. 1990), *cert. denied*, 498 U.S. 844 (1990), (reversing district court's downward departure for two married mothers convicted of embezzlement because mothers failed to explain how their family circumstances involving young children distinguished them from other embezzlers who have family responsibilities); *United States v. Sailes*, 872 F.2d 735, 739 (6th Cir. 1989) (affirming district court's refusal to depart downward for mother of seven children who was convicted of drug crime and sentenced to 45 months in prison).

Other circuits have similarly been reluctant to find that a even a single parent's responsibility for a child was a family circumstance so exceptional as to merit a sentencing departure. *See United States v. Sweeting*, 213 F.3d 95, 103 (3d Cir.), *cert. denied*, 531 U.S. 906 (2000), (rejecting district court's downward departure for single mother of five children, including one with Tourette's Syndrome, after noting that "incarceration of a single parent and its concomitant effects on the children simply cannot be characterized as out of the ordinary"); *United States v. Leandre*, 132 F.3d 796, 807-08 (D.C. Cir.), *cert. denied*, 523 U.S. 1131 (1998), (affirming district court's denial of defendant's bid for a downward departure based on fact that he was a single father of two children who might be placed in foster care when he was imprisoned, and noting that, though result may be harsh from children's perspective, it is not sufficient to take case out of heartland); *United States v. Rodriguez-Velarde*, 127 F.3d 966, 969 (10th Cir. 1997) (reversing district court's downward departure for defendant whose wife died subsequent to his arrest and left behind three children under the age of twelve, and noting that single parents are not a rarity in today's society and that their imprisonment may mean that children must live with relative, friends, or in a foster home). *But see United States v. Galante*, 111 F.3d 1029, 1037 (2d Cir. 1997) (affirming district court's downward departure for father who provided financial and emotional support to his wife and two children and was dedicated father); *United States v. Johnson*, 964 F.2d

18.   Defendant provides invaluable and incalculable emotional and financial support to all of these children. In short, she is their surrogate parent." J.A. at 292. Based on its findings of fact, the district court concluded that a downward departure to total offense level 10 was necessary to ensure that Reed could be placed in a community corrections center, where she would be able to "monitor her sister's family and continue her role in maintaining family stability" and she would be permitted to leave for a family emergency. J.A. at 288.

The government counters that this is not a true "family responsibilities" case because Reed is not the children's legal guardian. Moreover, the government notes that Reed has taken no action to become the children's legal guardian,[4] her financial support of the children is meager, and her time commitment to the children pales in comparison to that of a parent. According to the government, Reed's contention that she is an integral aspect of these children's lives is belied by the fact that, prior to her conviction in 1997, she spent at least one and sometimes several months of the year in Jamaica with her boyfriend. Appellant's Br. at 28. Finally, the government argues that the proper analysis in this case is not whether the children would be better off with the status quo, but whether any reasonable alternative, such as foster care, would create an extraordinary hardship when compared to the family circumstances of other federal inmates. *Id.* at 29.

This court has generally not approved of downward departures for family responsibilities based on a parent's obligation to a child. *See United States v. Calhoun*, 49 F.3d 231, 237 (6th Cir. 1995) (affirming district court's refusal to depart downward for mother who was sentenced to 87 months in prison because fact that defendant's fourteen-month old "infant may suffer does not give rise to an extraordinary

---

[4]The probation office stated, in a letter to the district court, that Reed did not attempt to terminate her sister's parental rights because Reed made a deathbed promise to her mother that she would attempt to keep her sister's family together. J.A. at 307.

contemplated by the Guidelines." *Id.* As for the delay and excess costs, we noted that these were possible bases for departure but that "[n]either the district judge nor Reed . . . has provided this court with any evidence that the length of the delay or the costs involved were unusual." *Id.* Concluding that the district court abused its discretion by departing downward at sentencing, we remanded to the district court with a narrow mandate: we stated that "the district court should consider only whether a departure *from its previously calculated total offense level of thirty-two is warranted, and, if so, to what extent departure is warranted.*" *Id.* at 995 (emphasis added).

On remand, the case was reassigned to Judge Avern Cohn due to Judge Gilmore's retirement. In July 1999, an updated Presentence Report was prepared to reflect our disposition of the case, as well as to account for the defendant's submissions relating to her family situation, her mental health, and her community service. J.A. at 546-47. Of note, Reed submitted a "family assessment" performed by a psychiatrist, which chronicled her role in caring for her sister's five children. Reed then moved again for a downward departure, arguing that her offense conduct was outside the heartland of conduct circumscribed by § 1956 and that the Guidelines overstated the seriousness of her conduct. She also argued for a downward departure based on extraordinary family circumstances.[3] J.A. at 92-98. The government disputed these bases for departure.

The district judge decided to bifurcate the sentencing process, and on November 30, 1999 and December 2, 1999 held hearings on whether he should depart downward based on Reed's offense characteristics. Subsequently, in a written

---

[3]Reed also argued for a downward departure based on her charitable works, the fact that this was aberrant behavior, the extreme emotional and financial toll of the prosecution, and proportionality in sentencing co-defendants. J.A. at 98-107 (Def's Motion for Downward Departure). The district court did not rely on any of these factors in sentencing Reed, and they are not before us in this appeal.

memorandum supplementing the hearings, the district judge determined that he would depart downward nine levels from a total offense level of 32 to level 23. J.A. at 283. He then referred the case to the probation office for a supplemental report on Reed's offender characteristics. Reed also submitted an updated family assessment to the probation department. On May 5, 2000, the district judge held a hearing on defendant's offender characteristics. At that hearing, the district judge announced his decision to depart downward 13 levels to level 10 based on Reed's extraordinary family circumstances. J.A. at 505-06, 508-09. This conclusion was memorialized in a memorandum dated May 16, 2000. J.A. at 285.

With a total offense level of ten and a criminal history category of I, Reed was sentenced to four years' probation, on condition that she spend 15 months in a halfway house and then perform 300 hours of community service. J.A. at 285. No fine was imposed. The government appeals from this sentence.

### III. ANALYSIS

#### A. Standard of Review

We review a district court's downward departure at sentencing for an abuse of discretion. *Koon v. United States*, 518 U.S. 81, 100 (1996). Under the abuse-of-discretion standard, the district court's determination that a particular factor is a permissible basis for departure is a question of law to which we need not defer. *Id.*; *United States v. Weaver*, 126 F.3d 789, 792 (6th Cir. 1997).

The relevant sentencing statute, 18 U.S.C. § 3553(b), states that a sentencing court shall impose a sentence within the applicable Guidelines range "unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." In determining whether the Commission has adequately

defendant be allowed to serve her sentence in a community corrections center. J.A. at 287.

The family assessments, prepared by a psychiatrist, state that Reed's sister, Valerie Reed, has five children, four of whom are under the age of 18, and that since 1989 Reed "has assumed a significant role in the development and upbringing of her nieces and nephews." J.A. at 125 (Family Assessment Report). According to the report, Reed helps to ensure the children eat properly, do their homework, and stay in school. She also provides them with much-needed emotional support. Significantly, the first family assessment stated that "Rosalind [Reed] is the glue that holds this family together and enables it to work as well as it does. Essentially, Rosalind raises the children and supervises her extremely immature, dysfunctional sister who is unable to cope with the responsibilities associated with raising five (5) children alone." J.A. at 129. The report also stated that Reed's "absence, even for a limited period, would wreak havoc to the children's beneficial development" and that "[h]er absence would doubtless lead to serious emotional problems for each child, whose growth and development is intrinsically tied to Rosalind." *Id.* Finally, the report cautioned that, were Reed to be imprisoned, the family was likely to fall apart and the younger children could be sent to foster care. J.A. at 130.

Departure for "family responsibilities" is a discouraged factor under the Guidelines, *see* U.S.S.G. § 5H1.6, and therefore is only proper in "exceptional cases." U.S.S.G., ch. 5, pt. H, introductory cmt.; *see also* U.S.S.G. § 5K2.0, policy stmt.; *Koon*, 518 U.S. at 96 (noting that court should depart downward based on discouraged factor "only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present"). In this case, the district court made several factual findings, based on the family assessments, to support its conclusion that Reed's family circumstances are extraordinary. The district court found that Reed "has assumed a critical role in the development and upbringing of her sister's five children, four of which are under the age of

the departure." *Id.* at 204. In this case, the district court analogized to § 2S1.2 in order to measure the proper extent of the departure. Assuming that a departure was warranted, the government concedes that § 2S1.2 is the most appropriate guideline for comparison because it deals with monetary transactions in property derived from drug trafficking, but does not require that the defendant have laundered the funds, have knowledge that the funds were the proceeds of a specified unlawful activity, or have an intent to further such an activity. *See* U.S.S.G. § 2S1.2, cmt. n.1.

Proceeding from the assumption that § 2S1.2 is the most appropriate guideline, the base offense level for that provision is 17, five levels are added if the defendant knew that the funds were the proceeds of an unlawful activity involving drug trafficking, and two levels are added if the funds exceed $200,000. This produces a total offense level of 24. As previously noted, the district court was not permitted to reconsider the amount of funds that were laundered, as that determination is foreclosed by this court's mandate in *Reed II*. Moreover, the sentencing court's original calculation of Reed's total offense level included two-level upward adjustments for abuse of a position of trust and obstruction of justice, respectively; these determinations also are not subject to revision, given our limited mandate on remand. Once these adjustments are added to Reed's base offense level, her total offense level becomes 28. In light of this analysis, the district court's decision to depart downward nine levels for offense characteristics, as opposed to four levels, from the original total offense level of 32, must be considered unreasonable and therefore an abuse of discretion.

## C. District Court's Departure for Offender Characteristics

In addition to its nine-level departure, the district court also departed downward 13 levels to account for Reed's family circumstances. The 13-level departure was based on the probation office's recommendation, subsequent to receiving two "family assessments" submitted by Reed, that the

considered a particular circumstance, a sentencing court should consider "only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission." *Id.*

The Guidelines Manual provides that a sentencing court should "treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted." U.S.S.G. ch. 1, pt. A, introductory cmt. 4(b). According to the Supreme Court, before a sentencing court may depart from the guideline range, "certain aspects of the case must be found unusual enough for it to fall outside the heartland of cases in the Guideline." *Koon*, 518 U.S. at 98. The Guidelines Manual offers some instruction on which factors make a case "atypical:" it mentions those which a sentencing court may not consider at all, such as the defendant's race or sex, while noting others which are specifically encouraged or disfavored. If a factor is disfavored, the Guidelines counsel that a downward departure should not be granted unless the case is "exceptional." U.S.S.G. ch. 5, pt. H, introductory cmt. Where the Guidelines do not mention a particular factor, "the court must, after considering the structure and theory of both relevant individual guidelines and the Guidelines taken as a whole, . . . decide whether it is sufficient to take the case out of the Guideline's heartland." *Koon*, 518 U.S. at 96 (internal quotation omitted).

## B. District Court's Departure for Offense Characteristics

For its first downward departure of nine levels, the district court relied on the following factors for its determination that Reed's offense conduct was atypical and therefore outside of the heartland of money laundering offenses: (1) Reed only participated at the end of a large-scale and long-running drug trafficking conspiracy; (2) the record did not reflect that she intended to facilitate additional drug transactions; (3) her

conduct was not in the mainstream of money laundering, in that she did not maintain secret bank accounts, or set up a business front to pass on dirty money; (4) Sumpter, a more culpable actor, was sentenced to 48 months' imprisonment; (5) Sumpter's wife, who directed the money transfers, was not prosecuted; (6) the government made no attempt to trace the laundered money or to forfeit it from Sumpter; (7) Reed was charged with violating a statute with the most severe penalties applicable to her conduct and under "highly unusual circumstances," J.A. at 278 (D. Ct. Corrected Memorandum); (8) and the jury's verdict appeared to be a compromise. J.A. at 275-78.

The district court then turned to analogous Guidelines provisions, namely § 2S1.2 for engaging in monetary transactions in property derived from specified unlawful activity, and § 2J1.2, obstruction of justice, in an effort to determine how far to depart downward from Reed's total offense level. Determining that § 2S1.2 best encompassed Reed's behavior, the district court noted that § 2S1.2 provides for a base offense level of 17, adds five levels if the defendant knew the funds were the proceeds of unlawful activity involving drug trafficking, *see* § 2S1.2(b)(1)(A), and adds two levels if the value of the funds exceeded $200,000, *see* § 2S1.2(b)(2). This provided the district court with a base offense level of 24 and, when cross-referenced with Reed's criminal history category of I, established a sentencing range between 51 and 63 months. J.A. at 283. Noting that if it concluded that Reed's offense involved only $100,000, because most of the money that passed through Reed's office was not laundered, the base offense level would be 23 and that any adjustments for abuse of trust and obstruction of justice would be offset by a 4-level minimal participant adjustment, under § 3B1.2, the district court concluded that a downward departure to a total offense level of 23 was appropriate in this case.

In our analysis, we examine first whether the Guidelines speak to a particular factor relied upon by the district court. Once we have determined that the downward departure is not

to the district court's judgment that this case involves facts that take it outside the "norm" of money laundering prosecutions. *See Koon*, 518 U.S. at 98 (stating that district court's decision to depart is due "substantial deference" because of the district court's "vantage point and day-to-day experience in criminal sentencing"). Therefore, we conclude that the district court's third factor is a permissible basis for departure, and that the district court did not abuse its discretion in concluding that this factor rendered Reed's case outside the heartland of crimes contemplated by the Guideline.

As the Supreme Court noted in *Koon*, "[w]hen a reviewing court concludes that a district court based a departure on both valid and invalid factors, a remand is required unless it determines the district court would have imposed the same sentence absent reliance on the invalid factors." *Koon*, 518 U.S. at 113. In this case, the only factor properly relied upon by the district court was the third factor, namely that Reed's conduct was incidental to the underlying criminal activity. If we conclude that the district court would have imposed the same sentence absent the erroneous factors, which we do because the remaining factor was the principal justification for the departure, then we need not remand the case for resentencing, provided that we are satisfied that the departure is reasonable under 18 U.S.C. § 3742(f)(2). *Williams v. United States*, 503 U.S. 193, 203 (1992). Therefore, we must now review the extent of the district court's downward departure to determine whether it was "reasonable." *See* 18 U.S.C. § 3742(e)(3); *Crouse*, 145 F.3d at 791 (stating that sentence outside applicable Guidelines range will be reviewed for reasonableness).

According to *Williams*, "[t]he reasonableness determination looks to the amount and extent of the departure in light of the grounds for departing." *Williams*, 503 U.S. at 203. "A sentence . . . can be 'reasonable' even if some of the reasons given by the district court to justify the departure from the presumptive guideline range are invalid, provided that the remaining reasons are sufficient to justify the magnitude of

defendant's conviction for "promotion" money laundering where defendant wrote checks for beepers and gave them to drug couriers to facilitate additional drug transactions).

What distinguishes these cases from Reed's is that each involved the prosecution of a defendant who directed both the underlying criminal activity and the long-standing money laundering which was intended to promote that activity; in contrast, Reed was a third-party money launderer, who participated in only two money laundering transactions. *See, e.g., King*, 169 F.3d at 1039 (defendant ran marijuana distribution business and repeatedly laundered money to promote the business); *Baez*, 87 F.3d at 810-11 (defendant ran cocaine distribution network and laundered money to promote that criminal activity); *Jackson*, 935 F.2d at 841 (defendant ran crack cocaine business and repeatedly laundered money to promote that criminal activity); *see also Haun*, 90 F.3d at 1100 (defendant, whose conviction for "promotion" money laundering was affirmed on appeal, owned business which he was promoting through frequent acts of money laundering). Moreover, because Reed was not a member of the drug trafficking conspiracy, she did not stand to benefit from the reinvestment of criminal proceeds back into the conspiracy, aside from assuring that she would be paid for her legal services, as did these other defendants. When we compare these other defendants' roles in their underlying criminal conduct with Reed's participation in the Sumpter/Maddox drug trafficking conspiracy, we must conclude that the district court did not abuse its discretion by finding that Reed's conduct was "incidental" to the criminal activity underlying the money laundering and that this factor could bring Reed's case out of the heartland of "promotion" money laundering offenses.

Although the district court erroneously relied on the lack of "concealment" in this case to justify the downward departure, the district court did find that the incidental nature of Reed's participation in the drug trafficking conspiracy constituted a justification for its departure. Given that the district court did not rely on an impermissible factor, we must ultimately defer

based upon an impermissible factor, we ask whether the factor is mentioned in the Guidelines and, if not, whether it is sufficient to take the case out of the relevant Guideline's heartland. *See Koon*, 518 U.S. at 95-96. In this case, none of the factors cited by the district court for its nine-level departure are deemed impermissible by the Guidelines, nor are they either discouraged or encouraged factors. Therefore, we must examine each factor in turn to determine whether it is accounted for by the relevant guidelines and, if not, whether it suffices to render this case "atypical."

We begin, however, by explaining that the language we used in *Reed II* was meant to circumscribe the district court's discretion at Reed's resentencing. Our statement that, on remand, "the district court should consider only whether a departure *from its previously calculated total offense level of thirty-two is warranted, and, if so, to what extent departure is warranted*," *Reed II*, 167 F.3d at 995 (emphasis added), was meant to bind the district court to the first district court judge's total offense level calculation of 32. That original calculation included two levels under § 2S1.1(b)(2) because the value of the laundered funds exceeded $200,000, and did not grant Reed any reduction for playing a minimal or minor role. The district judge on remand was not at liberty to disregard our mandate, and we proceed with our analysis from this premise.

After examining the district court's sentencing memoranda and the record in this case, we reject all but the third factor relied upon by the district court as a permissible basis for departure; therefore, we discuss that factor last. The district court first found, as a ground for departure, that Reed entered Sumpter's and Maddox's drug trafficking conspiracy at its conclusion, when all drug trafficking had allegedly ceased. We note that both §§ 2S1.1 and 2S1.2 account for the extent of the defendant's assistance to the underlying criminal activity by using the amount of laundered money as a specific offense characteristic. *See* U.S.S.G. § 2S1.1, cmt. (stating that "[t]he amount of money involved is included as a [sentencing] factor because it is an indicator of the magnitude

of the [underlying] criminal enterprise, and the extent to which the defendant aided the enterprise"). Because we believe that, by holding Reed responsible for $200,000, the Guideline already takes into account the degree of her participation in what was clearly a multi-million-dollar drug-trafficking enterprise, we conclude that this basis for departure was impermissible.

Moreover, as we noted above, Reed's original total offense level of 32 did not include a downward adjustment for a minimal or minor role under § 3B1.2. In light of our limited remand in *Reed II*, the district court was not at liberty to consider as a factor for downward departure conduct that was first rejected in calculating the defendant's total offense level. Therefore, to the extent that the district court's first factor involves the defendant's minimal or minor role in the underlying criminal activity, it is an impermissible basis for departure.

The district court's second factor, that the record did not support the inference that Reed intended to facilitate additional drug trafficking, conflicts with the jury's verdict and our conclusions in *Reed II*. As the government points out, the jury's verdict that Reed conspired to conduct a financial transaction, knowing that the object of the financial transaction was the proceeds of unlawful activity, with the intent to promote the unlawful activity, *see* 18 U.S.C. § 1956(h), forecloses the district court's finding. The jury necessarily had to find beyond a reasonable doubt that Reed conspired to promote unlawful drug trafficking. Indeed, in reviewing the jury's verdict, we found the evidence sufficient to support the verdict and concluded that Reed had the "requisite 'intent to promote.'" *Reed II*, 167 F.3d at 992-93 (stating that Reed's involvement in paying off an antecedent drug debt established her intent to promote drug trafficking and noting, in the alternative, that we also would have found that Reed "acted with the intent to facilitate the continuation of drug trafficking"). The district court's fact finding on remand cannot conflict with the jury's verdict and our

business front has no bearing on the question whether her offense was outside the heartland of § 1956(a)(1)(A)(i) convictions. *See Haun*, 90 F.3d at 1100 (noting that conviction under § 1956(a)(1)(A)(i) does not require proof of concealment or disguise).

The district court further noted that Reed was "not promoting drug dealing," "[t]he laundered money was used to pay lawyers and personal expenses," Reed's conduct "did not increase the public harm from the conspiracy," and her conduct was "minimal and incidental to the underlying crime." J.A. at 279-80. The first three findings of fact are, as noted above, in direct contradiction to our conclusion that the evidence adduced at trial was sufficient to prove that Reed did conspire to promote ongoing drug trafficking, that she had knowledge that Sumpter wanted to continue his drug dealing activities from prison, and that the money destined for California was intended to facilitate that plan. *See Reed II*, 167 F.3d at 993. By allowing Sumpter to continue his operations, Reed's conduct would necessarily have increased the public harm from Sumpter's drug trafficking. Whether the fact that Reed's conduct was incidental to the underlying drug trafficking suffices to remove her conduct from the heartland of "intent to promote" money laundering crimes is, however, a basis for departure that deserves fuller exploration.

In case law subsequent to *Reed I*, we have approved of money laundering convictions under § 1956(a)(1)(A)(i) for conduct similar to Reed's. *See United States v. King*, 169 F.3d 1035, 1039 (6th Cir.), *cert. denied*, 528 U.S. 892 (1999), (upholding defendant's "promotion" money laundering conviction for wiring money to his drug couriers in payment for prior marijuana deliveries and for current expenses incurred while making deliveries); *United States v. Baez*, 87 F.3d 805, 810-11 (6th Cir. 1996) (upholding defendant's money laundering conviction under "promotion" prong of statute for sending a courier to pick up drug proceeds in one state and deliver them in another); *see also United States v. Jackson*, 935 F.2d 832, 841 (7th Cir. 1991) (upholding

that the defendant's manner of laundering money was not in the mainstream of the offense and that it was incidental to the underlying criminal activity. In support of its determination that Reed's money laundering was outside the heartland of conventional § 1956 offenses, the district court stated:

> Defendant maintained no secret bank accounts, nor assisted in the maintenance of secret bank accounts. Defendant did not attempt to set up a business front or pass on, as the government calls it, dirty money, to Richard Sumpter so he could continue dealing in some manner or fashion in drugs. Nothing about the money going from Maddox to Richard Sumpter through defendant, while kept secret from the public and the government, was an effort to conceal.

J.A. at 276.

As the government noted in its brief, however, § 1956 makes criminal two different kinds of money laundering: the "concealment" of the underlying illegal activity, which is the more traditional form of laundering and is criminalized under §1956(a)(1)(B)(i), and the "promotion" of illegal activity, which is criminalized under § 1956(a)(1)(A)(i). Reed was prosecuted and convicted of conspiracy to violate the "promotion" prong, under which the government had to prove that Reed conspired to conduct a financial transaction which involved the proceeds of unlawful activity, with knowledge that the money was the proceeds of unlawful activity, and with the intent to promote the underlying criminal activity. *See United States v. Haun*, 90 F.3d 1096, 1100 (6th Cir. 1996), *cert. denied*, 519 U.S. 1959 (1997). The "concealment" prong, on the other hand, requires proof that a defendant conducted a financial transaction with criminal proceeds, with knowledge that the money was the proceeds of unlawful activity, and with knowledge that the transaction was designed, in whole or in part, to conceal or disguise the nature, location, source, ownership, or control of the money. Therefore, Reed's failure to conceal the proceeds of the unlawful activity by setting up a secret bank account or a

decision on appeal. Therefore, this second factor is also an impermissible basis for a downward departure.

As for the next three factors relied upon by the district court, that Sumpter's sentence was 48 months, Sumpter's wife was not criminally prosecuted, and Sumpter was allegedly permitted to keep the laundered money, none justify a downward departure. Supporting its decision to depart downward in this case, the sentencing court noted that although Sumpter was facing a sentence of between 135 and 168 months, he received only a 48-month sentence after the government moved for a downward departure on the basis of his substantial cooperation. The district court apparently determined that Sumpter was a more culpable actor in the drug conspiracy and that he deserved a far longer sentence than Reed. The government explains in its brief that the reason for the apparent disparity in their sentences is that Sumpter pleaded guilty, accepted responsibility, did not abuse a position of trust, or obstruct justice. Appellant's Br. at 23. Moreover, Sumpter's cooperation apparently made possible the prosecution of nearly thirty additional participants in the drug trafficking conspiracy. *Id.* Reed, on the other hand, did not cooperate, plead guilty, or accept responsibility for her actions; moreover, she abused a position of trust and obstructed justice, which conduct enhanced her sentence. The government also points out that, when compared with the defendants who chose to go to trial, Reed received a sentence proportional to her involvement in Sumpter's conspiracy. *Id.* at 24.

Although we have held that district courts are not precluded from departing from the Guidelines in order to conform one defendant's sentence with a co-defendant, *United States v. Epley*, 52 F.3d 571, 583 (6th Cir. 1995); *United States v. Nelson*, 918 F.2d 1268, 1275 (6th Cir. 1990), we have also held that a sentencing court may not depart downward to reconcile one defendant's sentence with another if the latter offered substantial assistance to the government while the former obstructed justice. *See Nelson*, 918 F.2d at 1275 (noting that "[r]ewarding one who has not cooperated with

authorities to essentially the same degree as those who have cooperated strains the incentives inherent in reward and punishment"). Moreover, the Guidelines do not permit a downward departure to place one defendant's "sentence significantly below those of the other perpetrators because of [the defendant's] more insignificant role in the offense, as the Guidelines do allow for that scenario under USSG §§ 3B1.1 and 3B1.2." *United States v. Crouse*, 145 F.3d 786, 791 (6th Cir. 1998). Because the district court clearly failed to take into account the effect on Sumpter's sentence of his extensive cooperation with the authorities, as well as the fact that Reed received upward adjustments for abuse of a position of trust and obstruction of justice, and was denied a downward adjustment under § 3B1.2 for minor role, the district court's reliance on Reed's ostensibly disproportionate sentence for downward departure is in error.

As to the fact that Sumpter's wife was not prosecuted, the government noted that she worked undercover and that all the evidence gathered against her was collected pursuant to her cooperation agreement. In an analogous situation, we have held that a district court may not depart downward to adjust a defendant's sentence to achieve proportionality with an unindicted co-conspirator who cooperated with the government. *See Epley*, 52 F.3d at 584. For these reasons and those explained above, the district court abused its discretion by relying on this basis to justify a downward departure for Reed.

Finally, the government disputes the district court's assessment that Sumpter was allowed to keep the money that was passed on to him through the money laundering conspiracy. According to the government, Sumpter forfeited the money that remained after the first delivery of cash to California, as well as all the money seized from the second delivery. Appellant's Br. at 24. In all, the government claims it administratively seized approximately $750,000 in this criminal prosecution. *Id.* at 24-25. Even if the government had not obtained this money through forfeiture, we do not believe this is a proper basis for departure because this factor

has nothing to do with whether Reed's criminal behavior was within the heartland of conduct contemplated by the relevant Guidelines.

As to the last two factors cited by the district court as supporting the nine-level downward departure — that Reed was prosecuted under the statute with the most severe penalties applicable to her conduct and "under highly unusual circumstances," and that the jury's verdict was a compromise — neither merits much discussion. The government's decision to prosecute Reed under a statute with a "severe" penalty is not cause for a downward departure, particularly because money laundering associated with drug trafficking is the primary conduct which 18 U.S.C. § 1956 was designed to criminalize. Moreover, the "unusual circumstance" of the case, namely that an en banc court overturned circuit precedent and thereby allowed Reed to be prosecuted for a cash delivery to a drug courier, does not demonstrate that Reed's conduct was sufficiently unusual to warrant a downward departure, but merely, as we noted in *Reed I*, that our circuit was conforming its case law with other circuits. *See Reed I*, 77 F.3d at 143. If anything, our decision in *Reed I* indicates that Reed's conduct was contemplated by the relevant Guideline. Finally, the district court noted that the jury apparently reached a compromise position when it acquitted Reed on one count of money laundering, hung as to the other count, and convicted only on the conspiracy count. Assuming that the verdict was a compromise, it does not take Reed's case out of the heartland of "intent to promote" convictions. Although the jury may have agonized over the verdict, its indecision was just as likely a product of its reluctance to send an attorney like Reed to prison — or any other number of concerns — than it was a reflection of the even balance between favorable and unfavorable evidence. By itself, the jury's verdict does not indicate that Reed's case was "atypical" or unusual in any way. The district court's reliance on this factor must be considered impermissible.

We turn now to the third factor, which the district court relied upon most heavily for its downward departure, namely