**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 05a0394n.06
Filed: May 13, 2005

**No. 03-1556**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

ROSALIND K. REED,                            )
                                             )      **ON APPEAL** FROM THE
    Petitioner-Appellant,              )      UNITED STATES DISTRICT
                                             )      COURT FOR THE EASTERN
v.                                           )      DISTRICT OF MICHIGAN
                                             )
UNITED STATES OF AMERICA,                    )
                                             )
    Respondent-Appellee.               )


**BEFORE:    NORRIS and DAUGHTREY, Circuit Judges; OLIVER, District Judge.**[*]

**PER CURIAM:** Petitioner-Appellant Rosalind K. Reed ("Ms. Reed" or "Appellant") was

convicted by a jury for conspiracy to commit money laundering. Ms. Reed appeals the district

court's denial of her motion pursuant to 28 U.S.C. § 2255. Ms. Reed, who was a criminal defense

attorney in Detroit, argues that the prosecutor engaged in prosecutorial misconduct by making

derogatory comments about criminal defense attorneys during his closing argument. For the reasons

stated below, we AFFIRM the judgment of the district court.

## I. BACKGROUND

This case has a long procedural history and has been before the Sixth Circuit on several prior

---

[*]      The Honorable Solomon Oliver, Jr., United States District Judge for the Northern
District of Ohio, sitting by designation.

occasions. *See United States v. Reed*, 77 F.3d 139 (6th Cir. 1996) (*en banc*) ("Reed I"); *United States v. Reed*, 167 F.3d 984 (6th Cir. 1999) ("Reed II"); *United States v. Reed*, 264 F.3d 640 (6th Cir. 2001) ("Reed III"). The relevant facts and procedural history have been previously summarized by the Sixth Circuit:

> This case arises out of a large marijuana distribution conspiracy. Principals in the conspiracy included Richard Sumpter, who supplied marijuana from California, and Jerome Maddox, who acted as Sumpter's Detroit distributor. The testimony of Sumpter and Maddox, who ultimately cooperated with the authorities after their arrests, and others established the following:
>
> Reed, a criminal defense attorney, was a friend and neighbor of Maddox. Sumpter was arrested in Detroit in January 1994, and Reed, at Maddox's request, undertook Sumpter's representation. Sumpter, while in custody, told Reed that he could not pay her legal fees unless Maddox paid off his drug debt (something in excess of $400,000). Reed agreed to act as a conduit for the flow of money and information between Sumpter and Maddox. On two occasions Maddox delivered large quantities of cash to Reed's law office and was met by Diana Fitch, Sumpter's wife. After Maddox and Fitch counted the money and gave a portion to Reed for legal fees, the remainder was left in Reed's office for subsequent pick up by Sumpter's courier, David "Flyboy" Delacour. On instructions from Reed, Selecia Wright, Reed's receptionist, gave the first bag of money to Delacour. A second receptionist, Diane McElroy, gave the second bag to Delacour on instructions from Fitch when Delacour arrived while Reed was out of the country. On his return to California from this second trip, Delacour was arrested, and the bag was found to contain $90,000 in currency.
>
> In addition to her knowingly facilitating this transfer of cash, the testimony indicated that Reed delivered notes from Sumpter to Maddox while Sumpter was jailed, that she discussed with Maddox Sumpter's plan to continue running the drug operation while he was jailed, and that she discussed Maddox's drug debt with Fitch. Eventually, Sumpter and Maddox agreed to cooperate with the authorities, and as part of that cooperation both men recorded conversations with Reed in which they attempted to capture Reed making inculpatory statements. Instead, Reed persistently denied involvement in or knowledge of any criminal activity.

-2-

On October 6, 1994 Reed was indicted on charges of money laundering, conspiracy to commit money laundering, and conspiracy to distribute marijuana. Pretrial, the government asked for a jury instruction that the delivery of cash could constitute a "financial transaction" for the purposes of the federal money laundering statute. Believing that the instruction was foreclosed by circuit precedent and given the prosecution's admission that no other transaction could be proven, the district court dismissed the money laundering counts. On appeal this court, sitting en banc, overruled contrary precedent and held that the delivery of cash as alleged in the indictment did constitute a "financial transaction." *See United States v. Reed*, 77 F.3d 139 (6th Cir.) (en banc) ("Reed I"), *cert. denied*, 517 U.S. 1246, 135 L. Ed. 2d 194, 116 S. Ct. 2504 (1996).

On March 20, 1996 Reed was re-indicted. After the district court denied Reed's motion to dismiss on the basis of an *ex post facto* prosecution under the money laundering statute, the case proceeded to trial. After lengthy deliberations . . . the jury convicted Reed of conspiracy to commit money laundering, acquitted her of conspiracy to distribute marijuana and of one substantive money laundering count, and deadlocked over the remaining money laundering count, as to which a mistrial was declared.

*Reed II*, 167 F.3d at 986-87; *see also Reed III*, 264 F.3d at 643-44 (discussing additional facts).

Following the jury's verdict, Ms. Reed was sentenced to 46 months, a downward departure from the Guideline range of 121-151 months. Joint Appendix ("J.A.") at 232. She appealed her conviction and the government cross-appealed the sentence. This court affirmed the conviction but vacated the sentence, concluding that the district court abused its discretion in granting the downward departure. *Reed II*, 167 F.3d at 994-995. On remand, the case was reassigned and Ms. Reed was sentenced to four years' probation with the special condition that she serve 15 months in a Community Correctional facility and that she perform 300 hours of community service. J.A. at 232. On a subsequent appeal, this court reversed and remanded, holding that several of the grounds relied upon by the district court for a downward departure were impermissible. *Reed III*, 264 F.3d 640. In May 2002, Ms. Reed was re-sentenced to 68 months in custody, followed by a two-year

term of supervised release.  J.A. at 232.

Ms. Reed then filed a motion pursuant to 28 U.S.C. § 2255 to vacate her conviction and sentence, claiming that she was denied effective assistance of counsel and requesting an evidentiary hearing.  J.A. at 246.  The district court denied the motion, adopting the Magistrate Judge's findings and conclusions.  *See Reed v. United States*, Crim. Case No. 94-80095 (E.D. Mich. Mar. 26, 2003).  J.A. at 231-251.  The district court then denied Ms. Reed's request for a certificate of appealability finding that "reasonable jurists would not debate the Court's conclusion that Petitioner was not deprived of the effective assistance of counsel."  *Reed v. United States*, Crim. Case No. 94-80095 (E.D. Mich. June 25, 2003)  J.A. at 373-75.  This court issued a certificate of appealability solely as to Ms. Reed's claim "regarding alleged prosecutorial misconduct and counsel's failure to raise the issue on appeal."  *Reed v. United States*, No. 03-1556 (6th Cir. Dec. 4, 2003).

Ms. Reed's claim of prosecutorial misconduct involves a statement that the prosecutor made during his initial closing argument.  After reviewing most of the evidence that had been presented at trial, the prosecutor stated:

> Ladies and gentlemen, I'm almost done with my portion of this argument.  It's my last opportunity to talk with you about this case.  You know, you probably have a lot of stereotypes and a lot of things that came into you[r] mind when you heard of this case and it involved a defense attorney.  Ladies and gentlemen, we have – or actually any attorney, because ladies and gentlemen we all have certain impressions and expectations from attorneys.  We actually based on what we see on TV, see in movies, and read in the paper, we expect – we almost expect attorneys to get money to their law office any way they can, and if that means having money go out with a courier so be it.  We are almost expected to hide bags of cash until the courier gets there.  We almost expect them to run around and try to tamper with a witness by putting – by trying to put the wrong bag defense in their mind.  We almost expect them to keep money off the books, their tax-free bonus, that high quality marijuana. . . .

You know, you come to expect from attorneys that, you know, they're going to keep that money off the books. We come to expect that they're going to destroy evidence, and they're going to burn it in a fireplace. Remember Jerome Maddox telling you, I'm never going to forget that paper burning in her fireplace. We expect they're going to scribble over their notes to make it hard for the jury to find the truth. And we expect that they're going to pass notes from people in prison to work with the drug debt amount. You know, we can expect that today, but you know it isn't right. It isn't legal. And there's only one body at this point that can tell the Defendant what you did was wrong. You wanted that money. You wanted that cash, on the books or off the books. The way to get the money, to get your cut of the money, was to bring it to the office. It's wrong, and it's illegal.

J.A. at 684-85.

## II. DISCUSSION

### A. Standard of Review

This court reviews a district court's denial of a § 2255 motion *de novo*, while examining findings of fact under a clearly erroneous standard. *Moss v. United States*, 323 F.3d 445, 454 (6th Cir. 2003). Ineffective assistance of counsel claims are mixed questions of law and fact that this court reviews under the *de novo* standard of review. *Mallett v. United States*, 334 F.3d 491, 497 (6th Cir. 2003).

To prevail on her claim, Ms. Reed must meet the well-known standard that: (1) her "counsel's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for the deficiency, the outcome of the proceedings would have been different." *Campbell v. United States*, 364 F.3d 727, 730 (6th Cir. 2004) (citing *Griffin v. United States*, 330 F.3d 733, 736 (6th Cir. 2003)). This court has held that "[t]he objective standard of reasonableness is a highly deferential one and includes a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Mason v. Mitchell*, 320 F.3d 604,

616-17 (6th Cir. 2003). A "reasonable probability" has been defined by the Supreme Court as "a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). The *Strickland* Court further stated that "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686.

## B. Analysis

### 1. Objective Standard of Reasonableness

In satisfying the first requirement of the test for ineffective assistance of counsel, Ms. Reed must establish that her lawyer's performance "'fell below an objective standard of reasonableness' as measured by 'prevailing professional norms.'" *Tinsley v. Million*, 399 F.3d 796, 802 (6th Cir. 2005) (quoting *Strickland*, 466 U.S. at 687-88). A failure to object to a prosecutor's comments or to raise the issue on direct appeal does not fall below an objective standard of reasonableness unless the comments constituted prosecutorial misconduct. *See, e.g.*, *Anderson v. United States*, 246 F. Supp. 2d 758, 762 (E.D. Mich. 2003) ("Because the prosecutor's remarks were not improper . . . counsel's performance was not deficient."); *Cook v. Stegall*, 56 F. Supp. 2d 788, 794 (E.D. Mich. 1999) ("Having found no [prosecutorial misconduct], we fail to see how defense counsel's failure to object was either deficient or prejudicial to the defendant's case.").

In this case, Appellant argues that the prosecutor's closing argument constituted misconduct because the remarks denigrated criminal defense attorneys as a group and invited the jury: (1) to discount Ms. Reed's defense counsel's arguments because criminal defense attorneys are unworthy of trust; and (2) to convict Ms. Reed because she, herself, was a criminal defense attorney.

Although the prosecutor's statements came closer to the line than desirable, they do not rise

to the level of prosecutorial misconduct recognized in *United States v. Solivan*, 937 F.3d 1146 (6th Cir. 1991). In *Solivan*, the prosecutor, during closing arguments, made a direct appeal to the jury to send a message to the defendant "and all of the other drug dealers like her" that drugs were not welcome in northern Kentucky. *Id*. at 1148. This court held that the statement was prejudicial to the defendant's right to a fair trial and thus constituted error because the comments were "calculated to incite the passions and prejudices of the jurors . . . ." *Id*. at 1151.

The instant case is distinguishable from *Solivan*. In *Solivan*, the prosecutor's statement was clearly intended to have the jury act as the conscience of the community to send a message that certain behavior was not tolerated. *Id*. at 1157 ("The statements were deliberately injected into the proceedings to inflame the jurors' emotions and fears associated with the current drug epidemic that is reported daily in our newspapers and which threatens the very fabric of our society."). However, in *Hicks*, this court found that the prosecutor's statements during closing argument that "it is time you sent a message to the community" and "the people in the community have the right to expect that you will do your duty," *id*., did not rise to the level of prosecutorial misconduct. We held that an appeal to the community conscience was not impermissible because the prosecutor's comments were an "arguably proper general reference[] to the societal need to punish guilty people, rather than an improper 'attempt to compare or to associate the defendant with a feared and highly publicized group. . . .'" *Hicks*, 384 F.3d at 219 (quoting *Bowling v. Parker*, 344 F.3d 487, 516-17 (6th Cir. 2003)).

In the instant case, there was no appeal to the jury to send a message to the community. But the statements may be compared to those in *Hicks* where the prosecutor exhorted the jury to do its duty. The gist of the statement was to send a message to Ms. Reed that she should not be able to get

away with the conduct demonstrated at trial. This message would not be inappropriate. As we recognized in *Solivan*, 937 F.3d at 1155, it is acceptable for a prosecutor to remind the jury that there is a general "community or societal need to convict guilty people." Throughout the prosecutor's comments regarding what people have come to expect from defense attorneys or lawyers, the prosecutor interspersed facts particular to Ms. Reed's case. For example, when he stated "And we expect that they're going to pass notes from people in prison to work with the drug debt amount," J.A. at 685, he was referring to testimony that was introduced at trial that indicated that Ms. Reed delivered notes from Mr. Sumpter to Mr. Maddox while Mr. Sumpter was jailed. *Reed II*, 167 F.3d at 986. This is consistent with the Respondent's argument that the prosecutor made the comments to avoid jury nullification – i.e., the jury's acquitting Ms. Reed because society expects lawyers to behave as she did.

There are thus at least two plausible interpretations of the prosecutor's closing argument, causing some ambiguity as to the intentions of the prosecutor. This court has held that "[i]f two plausible interpretations can be given to a prosecutor's ambiguous final argument, the court should not strive to adopt the one which casts doubt upon the prosecutor's intentions." *Angel v. Overberg*, 682 F.2d 605, 608 (6th Cir. 1982). In the instant case, as in *Hicks*, the prosecutor's statements "were devoid of the sort of inflammatory content inherent in the prosecutor's statements in [*Solivan*]." *Hicks*, 384 F.3d at 219. While the prosecutor did refer to an image of lawyer greed and lowered expectations that the jurors may have previously encountered in the media, it cannot be said that he spoke in a "comparable specific wider context of national attention and concern" such as the national "War on Drugs" context involved in *Solivan*. *Id*. Further, he did not exhort the jurors to send a message to the wider community but admonished them to hold Ms. Reed accountable for her

-8-

actions. Accordingly, *Solivan* is inapposite because "it is untenable to suggest that the prosecutor's statements were directed to the jurors' desire to end a social problem." *Id*.

Furthermore, the Supreme Court has advised that isolated statements of a prosecutor's argument,

> like all closing arguments of counsel, are seldom carefully constructed in toto before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear. While these general observations in no way justify prosecutorial misconduct, they do suggest that a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.

*Donnelly*, 416 U.S. at 646-47. This court should not "lightly infer" that the prosecutor's intent was to have the jury draw the most damaging meaning.

In sum, this court holds that the prosecutor's statements were not "improper." Accordingly, Ms. Reed's counsel did not render ineffective assistance of counsel for failing to object to the prosecutor's statements because even if appellate counsel had raised this issue on appeal, Petitioner would not have been able to make out a case of prosecutorial misconduct. For these reasons, Ms. Reed is not able to meet the reasonableness prong of the test for ineffective assistance of counsel.

### 2. Prejudice

Assuming, *arguendo*, that counsels' performance did fall below an objective standard of reasonableness, Ms. Reed must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Even if this court were to hold that Ms. Reed's counsels' performance fell below an objective standard of reasonableness for failure to object to the prosecutor's arguably improper comments, *Darden*, 477 U.S. at 181, this court can provide relief only if the statements were "so flagrant as to render the entire trial fundamentally unfair." *Hicks*, 384 F.3d at 219. Once this court finds that a statement is improper, four factors are considered in determining whether the impropriety is flagrant: (1) the likelihood that the remarks would mislead the jury or prejudice the accused; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally presented to the jury; and (4) whether other evidence against the defendant was substantial. *Id.*

First, it does not appear that the prosecutor's comments misled the jury; indeed, there was ample evidence of Ms. Reed's guilt already before the jury. In light of the evidence presented against Ms. Reed, the care taken during *voir dire* to ensure that jurors did not hold prejudices against criminal defense attorneys, and the instructions provided by the district court admonishing the jury to consider only sworn testimony and exhibits, the prosecutor's isolated statements cannot be said to have misled the jury. *See Solivan*, 937 F.2d at 1156 (prosecutorial error may be held harmless "because instructions given by the trial court sufficiently diluted or eradicated any resulting prejudice."). Second, the remarks were isolated in that the prosecutor only uttered them in his closing argument and nowhere else. For example, the trial transcript contained over 4,000 pages of which the prosecutor's allegedly inappropriate comments consumed less than two. Third, although the prosecutor made the statements deliberately, as noted above, there are multiple plausible and permissible interpretations of what the prosecutor meant by uttering the statements. Finally, as noted *infra*, the government presented ample evidence of guilt. In other words, there was overwhelming evidence from which a jury could have found beyond a reasonable doubt that Ms.

Reed was guilty of conspiracy to launder money, notwithstanding the prosecutor's comments during closing argument. *See id.* (prosecutorial error may be held harmless "in light of the relative strength of the evidence . . . .").

This court holds that even if the prosecutor's statements rose to the level of being "improper," they were not "flagrant" and thus could not have "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden*, 477 U.S. at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

Furthermore, there was overwhelming evidence against Ms. Reed that she was guilty of conspiracy to commit money laundering. This court, in an earlier proceeding, upheld Ms. Reed's conviction against a sufficiency of the evidence claim, holding that given all of the evidence against Ms. Reed, "a rational trier of fact could find beyond a reasonable doubt that Reed intended to promote further trafficking." *Reed II*, 167 F.3d at 993. This court wrote:

> Reed was aware that Sumpter, the payee, intended to continue drug trafficking although he was incarcerated awaiting trial. Reed admits this, but she attempts to refute any finding of intent to promote that activity by pointing to testimony that established Reed's stated belief that Sumpter's plan would be "crazy." J.A. at 454. Nevertheless, knowing Sumpter's intent, Reed acted to facilitate the transactions. Given other evidence of Reed's involvement, a rational trier of fact could find beyond a reasonable doubt that Reed intended to promote further trafficking.

*Id*. Finally, in *Reed III*, this court supplemented the factual record by emphasizing Ms. Reed's involvement in the conspiracy. We wrote:

> Sumpter told Reed that he could not pay Reed her legal fees until Maddox paid off his drug debt to him, an amount which the two men estimated to be in excess of $400,000. Reed then brokered Maddox's repayment by passing information between Maddox and Sumpter, who was incarcerated, and using her law offices as a drop-off and pick-up point for the money. On two separate occasions, on February

-11-

11, 1994 and March 10, 1994, Maddox delivered payments in excess of $100,000 to Reed's office, where he was met by Diana Fitch, Sumpter's wife. On each date, Maddox and Fitch counted the money in Reed's office and paid Reed her legal fees in cash, $15,000 on the first visit, and $20,000 on the second. Joint Appendix ("J.A.") at 557-58. After Reed was paid, the remainder of the money was stored in a bag in Reed's office for Sumpter's drug courier to retrieve and transport to California, which he did on two subsequent dates.

*Reed III*, 264 F.3d at 643-44. Mr. Delacour, Mr. Sumpter's courier, testified that Ms. Reed "told [him] where the bag [of money] was located and that that bag was located in her office behind a chair under some of Richard Sumpter's clothes." J.A. at 426. Ms. Wright, Ms. Reed's receptionist, testified that Ms. Reed had instructed her to give the bag to the person who came in and requested it. J.A. at 437. Ms. McElroy, a second receptionist for Ms. Reed, testified about how a courier came to Ms. Reed's office and picked up a bag for delivery to Ms. Fitch, Mr. Sumpter's wife. J.A. at 443-49. Mr. Sumpter testified extensively about Ms. Reed's involvement in the plan to transfer money between Mr. Sumpter and Mr. Maddox, using Mr. Delacour as a courier. *See, e.g.*, J.A. at 467-70.

In all, the government called dozens of witnesses and introduced over 100 exhibits and sub-exhibits. The trial, which was lengthy, began on September 11, 1996 and jury instructions were given on November 14, 1996. The trial transcript contained over 4,000 pages of which the prosecutor's allegedly inappropriate comments consumed less than two. The court allowed individual *voir dire* on many issues including a question as to possible bias against criminal defense attorneys. J.A. at 378-90. Finally, the district court specifically instructed the jury to consider only sworn testimony and exhibits and not on the lawyers' opening and closing statements:

> Now, first of all, ladies and gentlemen, in deciding this case you must decide it solely an[d] completely from the sworn testimony that has come to you from this witness stand, and from such exhibits that have bene [sic] received into evidence and nothing else. Incidentally, if you want the exhibits in your jury room you may have them by

-12-

merely asking the clerk to deliver them to you. But opening statements of the lawyers, colloquy between the Court and counsel, and final arguments of the lawyers, all these things are important in pointing out the issues in the case, but when you come to make your decision, your decision must be based solely and completely on the sworn testimony and exhibits received in evidence and nothing else.

J.A. at 702-03.

In short, the evidence presented against Ms. Reed was overwhelming. While it is true that the jurors found the evidence insufficient to prove her guilty beyond a reasonable doubt on the substantive money laundering counts or on the conspiracy to distribute marijuana count, the evidence clearly indicated that Ms. Reed conspired with others to commit money laundering. It is unclear *why* the jurors engaged in such lengthy deliberations. *Reed II*, 167 F.3d at 991 ("The district judge carefully avoided getting into the substance of the deliberations . . . ."). It is fair to say, however, that whatever reticence the jury had in concluding that Ms. Reed had engaged in money laundering herself, or had committed conspiracy to distribute marijuana, there was strong evidence to support her conviction on conspiracy with others to commit money laundering defendants in violation of 18 U.S.C. § 1956(h).[1]

This court, in *Reed II*, explained that the "specified unlawful activity" could either be the payment of an antecedent drug debt or the continuation of drug trafficking. *Reed II*, 167 F.3d at 993. Ms. Reed admitted she was aware that the payee, Mr. Sumpter, intended to continue his drug trafficking activities while incarcerated, though she sought to diminish the import of that admission with her stated belief that his plan would be crazy. *Id*. at 993. Nevertheless, the evidence is clear

---

[1]  18 U.S.C. § 1956(h) provides: "Any person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

-13-

that, knowing Mr. Sumpter's intent, Ms. Reed acted to facilitate the transactions and, therefore, acted "with the intent to promote the carrying on of specified unlawful activity."  18 U.S.C. § 1956(a)(1)(A)(i); *Reed II*, 167 F.3d at 992-93.  Despite the jury's inability to reach guilty verdicts on the remaining counts, there was overwhelming evidence to support Ms. Reed's conviction for conspiracy to commit money laundering.  As a consequence, the court concludes that even if the failure of Ms. Reed's trial counsel to object could be viewed as falling below an objective standard of reasonableness, the result of the proceedings would not have been different.

In sum, this court holds that even if the prosecutor's comments rose to the level of misconduct such that Ms. Reed's counsels' performance fell below an objective standard of reasonableness, Appellant cannot demonstrate that the comments were prejudicial in leading the jury to convict her of conspiracy to commit money laundering because the prosecutor's statements were not flagrant and because the evidence against her was overwhelming.  Accordingly, Ms. Reed has not established that her appellate counsel was ineffective, or that she suffered prejudice as a result of the alleged misconduct by the prosecutor.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.