RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0166P (6th Cir.)
File Name: 03a0166p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,
*Plaintiff-Appellant,*

v.

No. 01-1956

VIRGINIA COCKETT,
*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 99-80983—Arthur J. Tarnow, District Judge.

Argued: March 27, 2003

Decided and Filed: June 2, 2003

Before: BOGGS, SUHRHEINRICH, and SILER, Circuit
Judges.

───────────────

**COUNSEL**

**ARGUED:** Patricia G. Gaedeke, UNITED STATES
ATTORNEY, Detroit, Michigan, for Appellant. Penny R.
Beardslee, FEDERAL PUBLIC DEFENDERS OFFICE,
Detroit, Michigan, for Appellee. **ON BRIEF:** Sarah Resnick
Cohen, UNITED STATES ATTORNEY, Detroit, Michigan,
for Appellant. Penny R. Beardslee, FEDERAL PUBLIC
DEFENDERS OFFICE, Detroit, Michigan, for Appellee.

BOGGS, J., delivered the opinion of the court, in which
SILER, J., joined. SUHRHEINRICH, J. (pp. 18-30),
delivered a separate dissenting opinion.

───────────────

**OPINION**

───────────────

BOGGS, Circuit Judge. On March 29, 2000, a grand jury
returned a superseding indictment charging Virginia Cockett
with twenty-two counts of aiding and assisting in the
preparation of a false federal income tax return, in violation
of 26 U.S.C. § 7206(2), and four counts of failing to file a
federal tax return, in violation of 26 U.S.C. § 7203. After the
district court severed the four failure-to-file counts from the
indictment, a jury trial commenced in which the remaining
twenty-two counts of aiding and assisting in the preparation
of a false tax return were tried. The government dismissed
Count One of the indictment due to the unavailability of a
witness during the trial and on November 30, 2000, the jury
found Cockett guilty on Counts Two through Twenty-two of
the indictment.

On May 1, 2001, the district court departed downward from
a sentencing range of 15-21 months' incarceration to two
years' probation on each count, to be served concurrently.
The government appeals Cockett's criminal sentence, arguing
that the district court's finding at sentencing, that Cockett was
suffering from a significantly reduced mental capacity at the
time of the offense, directly conflicts with the jury's verdict
and therefore the downward departure was in violation of law.
In the alternative, should we find that such a departure is
permissible as a matter of law, the government contends that
the record clearly did not support the district court's factual
determination. We reject these arguments and affirm the
district court's decision to depart downward.

## I

In 1997 and 1998, Virginia Cockett prepared twenty-one false federal tax returns for nine individual low-income women, in order to obtain a refund for each woman under the Earned Income Tax Credit provision of the Internal Revenue Code.[1] At that time, Cockett was a nurse at the Grace Ross Medical Center in Detroit, Michigan. While at the medical center, she met several women who brought their children in for health services. Cockett offered to prepare tax returns for these women, along with other women she knew in her neighborhood. Cockett entered inflated income figures and false information regarding each woman's dependants on the returns. Several of the women for whom she prepared returns testified that Cockett requested one-half of the refund received from the IRS as compensation for preparing each return, yet in several cases she did not receive this "payment." When the refunds did not arrive from the IRS as anticipated, Cockett, on two occasions, wrote letters to the IRS inquiring into the status of the refunds.

Although Cockett prepared these returns and letters, she did not enter her name as the tax preparer on the forms, nor did she sign her name to the letters sent to the IRS. Cockett also back-dated several returns, in order to make it appear that they were filled out before the filing deadline. When the authorities finally caught up with Cockett, she admitted having prepared the twenty-one returns at issue in this case, but told the IRS agent investigating her case that the income information reported on the returns was provided by the respective taxpayers. Cockett was indicted on March 29,

---

[1] The Earned Income Tax Credit (EITC) or the Earned Income Credit (EIC) is a refundable federal income tax credit for low-income workers, intended to provide an incentive to work. The credit reduces the amount of Federal tax owed and can result in a refund check when the EITC exceeds the amount of taxes owed. The amount of the refund depends primarily on a taxpayer's earnings and the number of children in the household.

2000, on twenty-two counts of aiding and assisting in the preparation of false federal tax returns.

As of April 5, 2000, Cockett began seeing a psychologist, Dr. Michael Abramsky, on a weekly basis. Dr. Abramsky sought a psychiatric consultation for psychotropic medication and prescribed Prozac for Cockett. In taking Cockett's history, Dr. Abramsky noted that Cockett appeared to have suffered from intermittent immobilizing depressions over the last fifteen years and was somewhat naive, rigid, and had difficulty "being insightful about her own situation."

Based on Dr. Abramsky's representations, the district court ordered a psychological evaluation of Cockett, to determine her competency to stand trial. The court ordered that the evaluation be done by another psychologist, Dr. Newton Jackson, who was agreed to by both the government and the defense counsel. Dr. Jackson met with Cockett for a total of three hours on April 11, 2000 and April 17, 2000. She also completed the Minnesota Multiphasic Personality Test - Second Edition (MMPI-2). Dr. Jackson stated in his report that Cockett was experiencing perceptual disturbances and that she appeared "to exhibit moderate to severe symptoms of both a depressive disorder and a thinking disorder at the present time." In analyzing the MMPI-2 results, Dr. Jackson noted that "[p]ersons with this broad-ranging form of profile elevation often are diagnosed as seriously mentally ill," and that since her "F(p) scale scores" were all within normal limits, it was unlikely that she was attempting to fake an impairment. On this basis, Dr. Jackson concluded that although Cockett "appears to understand in general the nature and object of the proceedings against her," she was not competent to stand trial since her mental condition prevented her from cooperating "in a rational manner with an attorney in preparing a defense for herself." Nevertheless, Dr. Jackson noted that if Cockett were to be provided with appropriate psychoactive medications and psychotherapeutic treatment, she would be able to achieve the competency necessary to stand trial within the time limit permitted by statute. Finally, Dr. Jackson stated that he was unable, during this initial

evaluation, to form an opinion regarding her legal sanity at the time of the alleged offenses.

Relying on Dr. Jackson's report, the district court declared Cockett incompetent to stand trial on April 28, 2000, but further ordered that Cockett submit to psychological treatment, pending a re-evaluation of her status. Cockett continued with her therapy under Dr. Abramsky's care. In August 2000, Dr. Jackson again evaluated Cockett's condition and determined that Cockett was now fit to stand trial. Furthermore, Dr. Jackson concluded that he could now address the question of her mental condition at the time of the alleged offenses, noting in relevant part:

Mrs. Cockett's narrative indicated that at the time of the alleged offenses, she believes she was attempting to assist others in filing for tax refunds to which they were legitimately entitled. However, Mrs. Cockett also described experiencing significant symptoms of depression and occasional symptoms of a thought disorder at those times, and she recalled being so immobilized and confused that she was unable to bring enough coherency and organization to her own documents in order to file her personal tax returns on time.

Despite Mrs. Cockett's admitted mental difficulties around the times of the alleged offenses, she insisted that at no time did she willfully or deliberately engage in any behavior which she knew would be wrongful.

In this examiner's opinion, Mrs. Cockett's ongoing psychiatric symptoms at the time of the alleged offenses did not rise to a level which would have caused her to be unable to appreciate the wrongfulness of her conduct. Mrs. Cockett is not viewed by this examiner as being able to meet the criteria for legal insanity at the time of the charged offenses. However, she does appear to have been experiencing confusion and impairment in her thinking and judgment during those periods of time.

On November 28, 2000, the trial commenced. The defense theory at trial was that Cockett did not act willfully, having prepared the returns for the women in this case with a good-faith belief that she was not acting in violation of the law. In support of this theory, the defense presented the testimony of Cockett's sister, Joyce Bloodsaw, and Dr. Jackson, as well as the records of her attendance at the medical center from 1994 through 1999. Bloodsaw provided information about Cockett's difficult life,[2] and described the changes that she observed in her sister's appearance and mental condition during the relevant time period. The attendance records, testified to by Dwayne Ewell of the Human Resources Department at the medical center, demonstrated that Cockett was often late, took sick leave and vacation, and had unpaid absences. In response to the defense's case, the government called Cockett's supervisor, Marjorie Harris, as a rebuttal witness, who testified that she had not noticed a change in Cockett's behavior in terms of her professionalism and organization until after her son died in August 1999. However, Harris acknowledged that she did not see Cockett every day, as they both had duties off site, and had not associated with Cockett outside of work.

On November 30, 2000, the jury rendered its verdict of guilty on all counts, thereby rejecting Cockett's defense. The probation department subsequently issued a presentence investigation report, which calculated Cockett's total offense level to be 14, with a criminal history category of I. The resulting sentencing range was 15 to 21 months of incarceration.

Prior to sentencing, Cockett moved for a downward departure on the basis of various grounds, including a diminished capacity and mental health condition pursuant to sections 5K2.13 and 5H1.6 of the United States Sentencing Guidelines (USSG). In support of the motion, Cockett

---

[2]Including the fact that Cockett was stabbed 26 times by her husband when she was pregnant in the late 1960s and the fact that her son had been murdered in 1999.

submitted Dr. Jackson's prior evaluation reports, along with a letter from Dr. Jackson dated March 19, 2001, and a letter from Dr. Abramsky, dated February 21, 2001.

In his March 2001 letter, Dr. Jackson took a stronger position than in his previous reports, stating in relevant part:

> On the basis of my interviews with Mrs. Cockett, it appeared to me that although she engaged in illegal behaviors, she could not consider herself to have been a conscious and willful lawbreaker. Her image of herself is of a person who helps others, rather than a person who takes advantage of them.

> At the time Mrs. Cockett committed the offenses leading to her finding of guilt, it is my opinion that she was experiencing ongoing symptoms of impairment in her ability both to exercise the power of reason and to control her behavior. Thus, although Mrs. Cockett has been found guilty of committing the offenses with which she was charged, it is my opinion that she did so while suffering a significantly reduced mental capacity. She continues to exhibit some of these symptoms, and ongoing support and followup care for her is indicated. She does not appear to exhibit any antisocial personality characteristics which would cause her to be a risk for further illegal actions if she was not incarcerated.

Dr. Abramsky similarly noted in his letter that "I have never found that Ms. Cockett can understand that she actually did something wrong . . . [and] her denial of responsibility is not a conscious, manipulative or practiced one." He also stated that for the last fifteen years, Cockett has suffered from an intermittent immobilizing depression.

The government objected to the downward departure requested by the defense, arguing primarily that her crime required a level of "acumen and intellectual sophistication" that could not be reconciled with a defense of diminished capacity, that her lack of signature on the returns combined with the fact that she did not give most of the taxpayers

copies of their returns suggests that she knew what she was doing and was trying to avoid detection, and that there was no evidence of a link between Cockett's emotional difficulties and her criminal behavior. Ultimately the district court granted Cockett's request for a downward departure on the basis of USSG §5K2.13, finding that Cockett had committed the offense of aiding and assisting in the preparation of false tax returns while suffering from a significantly reduced mental capacity.

## II

### Did the District Court Err as a Matter of Law in Departing Downward?

Although we generally review a district court's decision to grant a downward departure for abuse of discretion, *United States v. Stewart*, 306 F.3d 295, 329 (6th Cir. 2002), we review a district court's determination that a particular factor is a permissible basis for departure *de novo*, as it is a question of law and not fact. *United States v. Reed*, 264 F.3d 640, 646 (6th Cir. 2001). Since we are being asked to determine if the district court erred as a matter of law in departing downward on the basis of diminished capacity, where the jury determined that Cockett acted voluntarily and deliberately in committing her offense, we review this issue *de novo*.

As a preliminary matter, the government is correct that the district court, when sentencing a defendant under the guidelines, cannot rely on a finding that directly conflicts with the jury's verdict. *Reed*, 264 F.3d at 648. In *Reed*, the defendant, a criminal defense attorney, was convicted of conspiracy to launder money based upon her conduct of using her office as a pick-up and drop-off point for money exchanged between a supplier and a distributor of narcotics. Reed facilitated the payments when the supplier, her client, informed Reed that he could not pay her legal fees until the distributor repaid his drug debt. When the exchange was made, a portion of the money exchanged was used to pay the legal fees owed to Reed by the drug supplier. The remaining money was stored in Reed's office for her client's drug

courier to retrieve and transport out of state. *Reed*, 246 F.3d at 643-44.

At sentencing, the district court departed downwards from the applicable guideline range, relying on a number of different factors, including that "the record did not reflect that she intended to facilitate additional drug transactions." *Id*. at 646. This court held that this was an impermissible basis for a downward departure, since it conflicted directly with the jury's verdict that necessarily found beyond a reasonable doubt that Reed conspired to promote unlawful drug trafficking. *Id*. at 648.

Similarly, the government would prevail in this case if a finding by the district court of diminished capacity could only be understood to contradict directly with the jury's verdict, which found Cockett guilty beyond a reasonable doubt of voluntarily and intentionally violating the tax laws. However, unlike the situation in *Reed*, it is possible to reconcile these two findings, given their differing scopes of application and the fact that a direct causal link between the sentencing factor and the offense conduct is unnecessary.

### Diminished Capacity as a Sentencing Factor

The Guidelines' approach to taking into account a defendant's diminished capacity in sentencing began with the Sentencing Reform Act in which Congress directed the Commission to consider the relevance of certain offender characteristics, including a defendant's "mental and emotional condition to the extent that such condition mitigates the defendant's culpability." 28 U.S.C. § 994(d)(4)(1994). The Commission followed through on this direction in its preliminary draft of the sentencing guidelines, noting that a "mitigating factor might be the presence of a serious mental disability that did not rise to the level of a successful defense." Preliminary Draft of Sentencing Guidelines for United States Courts, 51 Fed. Reg. 35,080, 35,131 (Oct. 1, 1986). A year later, the Commission noted in its proposed guidelines that an offense level could be decreased for "Diminished Capacity" if "the defendant committed a non-

violent offense while suffering from significantly reduced mental capacity not resulting from voluntary use of drugs or other intoxicants, . . . provided that the defendant's criminal history does not indicate a need for incarceration to protect the public." Proposed Sentencing Guidelines for United States Courts, 52 Fed. Reg. 3920, 3970 § Y218 (Feb. 6, 1987).

The concept of diminished capacity was eventually codified and placed in Chapter 5, Part K (Departures) of the Guidelines, which lays out certain recognized factors for departure from an applicable sentencing range not "adequately taken into account by the Sentencing Commission in formulating the [G]uidelines." 18 U.S.C. § 3553(b). *See also* USSG §5K2.0; *Koon v. United States*, 518 U.S. 81, 94-96 (1996). The Commission identified a defendant's reduced mental capacity as one circumstance in which a departure would be encouraged, noting that such an impairment would normally constitute grounds for departure. *See* USSG §5K2.13; USSG Ch. 1, Pt. A(b), Departures. Specifically, section 5K2.13 of the USSG authorizes a downward departure for diminished capacity "if the defendant committed the offense while suffering from a significantly reduced mental capacity." The application note for this section illustrates that the departure is intended to address both cognitive and volitional impairments, stating that a "significantly reduced mental capacity" means "the defendant, although convicted, has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful." USSG §5K2.13, comment. (n.1).

### Willfulness in the Context of a Criminal Tax Case

In criminal tax cases such as this one, the government must establish that the defendant acted "willfully" at the time of the offense. *Cheek v. United States*, 498 U.S. 192, 200 (1991). The government is required to establish "willfulness" in criminal tax cases because Congress determined that, due to

the proliferation and complexity of tax laws, an individual should not be prosecuted for failing to adhere to a tax law unless the individual was aware of the law and consciously disregarded it. *See id*. at 199-200. Thus, in finding Cockett guilty of violating 26 U.S.C. § 7206(2), the jury was required to find that she had willfully aided and assisted in the preparation of false tax returns. *United States v. Sassak*, 881 F.2d 276, 278 (6th Cir. 1989). At Cockett's trial, the jury was instructed on the requisite mental state as follows:

"Willfully" means a voluntary, intentional violation of a known legal duty. In other words, to act willfully means to act voluntarily and deliberately with the specific intent to do something the Defendant knew the law prohibited. Willfulness necessarily depends on the Defendant's state of mind at the time the acts for which she is charged were committed. The word "knowingly" also means to act voluntarily and intentionally, and not because of mistake, accident or other innocent reasons. Accidental, inadvertent or negligent conduct does not constitute willful conduct.

In returning a guilty verdict, the jury found beyond a reasonable doubt that Cockett acted voluntarily and understood that her behavior was wrong. The government argues that the judge could not, therefore, in the sentencing phase find, by a preponderance of the evidence, that Cockett had a significantly reduced mental capacity, as this would, in its opinion, contradict the jury's verdict.

We have already stated that if the sentencing factor of diminished capacity can only be viewed as directly conflicting with the jury's verdict in this case, it cannot stand. Furthermore, Cockett's contention that the government's position fails because there is a lower standard of proof at sentencing, requiring only that a judge's findings be supported by a preponderance of the evidence rather than proven beyond a reasonable doubt, is in error. In fact, the government would prevail despite the lesser burden at sentencing, if we assumed that the defense and the mitigating factor were *not* appreciably

different. In other words, if a downward departure were available only where Cockett had not acted willfully, there is no question that the judge could not subsequently find by a preponderance of the evidence that Cockett had not acted willfully, since the jury found beyond a reasonable doubt that Cockett had acted willfully. For this reason, many of the cases cited by Cockett are not relevant, as they reflect situations in which a defendant was not able to prove by clear and convincing evidence that he was insane, yet the judge at sentencing applied a lower standard and found that there was enough evidence for the application of a mitigating factor on this basis.

Nevertheless, the government is not correct in concluding that the jury's verdict, finding that Cockett had acted willfully, and the judge's finding of diminished capacity are necessarily in conflict. In other words, Cockett could voluntarily and intentionally violate the tax laws, but nevertheless be impaired in her ability to exercise the power of reason. Impairment does not mean total absence of reason. For example, a mentally retarded individual could know that throwing a grenade into a neighbor's yard is wrong and against the law, yet still be eligible for a downward departure under section USSG §5K2.13 because his power to exercise reason would be impaired. After all, it is reasonable to assume, as the Sentencing Reform Act directs, that the person's mental retardation would in fact *mitigate* the defendant's culpability, even though not negating it.[3]

This scenario raises the question of the extent to which an impairment must have a causal link to the offense committed.

---

[3] This example is not meant to suggest that Ms. Cockett is mentally retarded; this example is not an analogy to Cockett's situation. *See Dissent* at 20 n.2, *contra*. Part II of this opinion is intended *only* to address the government's contention that as a matter of law one cannot depart downward on the basis of diminished capacity, where the jury has determined that the crime was committed voluntarily and deliberately. We address in Part III the question of whether in this specific case the district court committed clear error by departing downward.

If a direct causal link were required between the sentencing factor of diminished capacity and the offense, it would be difficult in this case for Cockett to prevail, as it is not apparent that her impaired ability to reason directly caused her to commit the offense. However, while it is necessary for an acquittal that a defendant prove at trial that but for his mental health problems, he would not have committed the offense, *see* 18 U.S.C. § 17, such a direct link is not necessary for purposes of finding that a defendant's mental health condition warrants a downward departure at sentencing, s*ee United States v. Sadolsky*, 234 F.3d 938, 942-43 (6th Cir. 2000) (holding that section 5K2.13 "does not require a direct causal link between the [significantly reduced mental capacity] and the crime charged.").

In *Sadolsky*, this court considered the question of whether a defendant's gambling problem would justify a downward departure only if he had been arrested for gambling, rather than fraud. *Ibid.* The court ultimately held that it was possible to grant a downward departure to defendants who are compulsive gamblers for crimes other than, but motivated by, a gambling compulsion. *Id.* at 943. This result is supported by the plain language of section 5K2.13, which notes that "the extent of the departure should reflect the extent to which the reduced mental capacity [of the defendant] *contributed* to the commission of the offense." (emphasis added). After all, the "purpose of [section 5K2.13 is] to mitigate the sentence of one who suffers from a diminished mental capacity." *Ibid.*

In sum, since it is possible to reconcile the jury's verdict against Cockett with the existence of a "significantly reduced mental capacity" as defined by the sentencing guidelines, the district court did not err as a matter of law by taking into account this factor when departing downward from Cockett's applicable sentencing range.

## III

### Did the District Court Commit Clear Error in Finding that Cockett Suffered from a Significantly Reduced Mental Capacity?

When examining factual determinations made by the district court for the purpose of applying the Sentencing Guidelines, we review for clear error. *See* 18 U.S.C. § 3742(e); *United States v. Cooper*, 302 F.3d 592, 594 (6th Cir. 2002). Thus, we cannot disturb the district court's determination that Cockett committed the offense of aiding and assisting in the preparation of twenty-one false federal income tax returns while suffering from a significantly reduced mental capacity, unless the judge committed clear error in doing so.

The government argues that the district court could not have found, after viewing all of the evidence, either that Cockett suffered from a reduced mental capacity at the time of the offense or, in the alternative, that her reduced mental capacity contributed to the commission of the offenses in this case. In support of these contentions, the government points out that in order for Cockett to have perpetrated this crime, she had to have understood the complexities of tax law, and thus her ability to reason was intact. Moreover, she had to be able to appreciate the wrongfulness of her behavior, since she did not sign the tax returns, demonstrating an effort to conceal her behavior, and also back-dated several of the forms. The government also contends that Cockett's motive was clear, as she requested to be paid half of the refund in some cases and even put her own address on some of the returns, the government argues, so that she would be able to ensure her own compensation. Finally, the government argues that Cockett's "clients," her supervisor, and the IRS agent who interviewed her all testified that she was generally clear in her thinking during the time period in which she was committing the offense at issue. The government's theory is that if Cockett does suffer from a diminished mental capacity, this condition arose after August 1999, when her son was killed,

and was not a factor that contributed to the commission of her crime. Furthermore, the government argues that the district court in ruling otherwise, has done so out of sympathy for the defendant and the traumatic events in her life, rather than on the basis of facts that can be considered in relation to the Sentencing Guidelines.

A district court's decision to depart from the guidelines is generally "due substantial deference, for it embodies the traditional exercise of discretion by a sentencing court." *Koon*, 518 U.S. at 98. The Supreme Court explained further:

> Before a departure is permitted, certain aspects of the case must be found unusual enough for it to fall outside the heartland of cases in the Guideline. To resolve this question, the district court must make a refined assessment of the many facts bearing on the outcome, informed by its vantage point and day-to-day experience in criminal sentencing . . . . District courts have an institutional advantage over appellate courts in making these sorts of determinations, especially as they see so many more Guideline cases than appellate courts do.

*Ibid.* Thus, the government has a heavy burden to bear, for we must decide, in order to overturn the district court's decision to depart downward in this case, that the district court was clearly erroneous in finding that Cockett committed her crime while suffering from a significantly reduced mental capacity and in finding that this case fell outside of the heartland of cases covered by the Sentencing Guidelines.

There is enough evidence to support the conclusion that Cockett suffered from a depressive disorder and a thinking disorder, which potentially impaired Cockett's power of reasoning. Both psychologists, Dr. Abramsky and Dr. Jackson, came to this conclusion independently, and their conclusions were supported by the Minnesota Multiphasic

Personality Test, which was administered by Dr. Jackson.[4] Furthermore, such a disorder is explicitly linked to a diminished capacity to reason *during the relevant time period.* This is particularly true with respect to Dr. Jackson, who noted in his second evaluation that Cockett's "operational judgment appears to have been significantly flawed for several years," and later stated in his post-trial letter that "[a]t the time Mrs. Cockett committed the offenses leading to her finding of guilt, it is my opinion that she was experiencing ongoing symptoms of impairment in her ability both to exercise the power of reason and to control her behavior." Moreover, no medical evaluations were offered to contradict these diagnoses. Instead, the government relies on testimony that she appeared to be clear in her thinking when carrying on conversations and on the alleged complexity of the crime, balanced against her sister's testimony that she was paranoid and not rational in her thinking. However, not only was the crime itself fairly simplistic, the district court is in the best position to weigh the testimony of witnesses. The district court did not clearly err in finding that Cockett's mental condition was impaired during the time of the offense.

The second question is whether it is possible to conclude that Cockett's mental disorders contributed to her offense. The government lays out a very convincing argument that Cockett was intellectually sophisticated, understood that she was lying on the forms and violating the law, and was in control of her behavior to the point where she sought out clients and assisted these clients in filing false tax returns in order to receive refunds. However the psychologists contend that Cockett was significantly impaired in her ability to

---

[4]Dr. Jackson concludes in his report on the results of the test that "[p]ersons with this broad-ranging form of profile elevation often are diagnosed as seriously mentally ill and they exhibit patterns indicative of both a thought and a mood disorder . . . . Low self-esteem and lack of coping abilities co-exist with impaired judgment, perceptual and cognitive impairment, and a heightened level of impulsive behaviors." These results are supportive of the doctors' opinions, and furthermore do not support the contention that Cockett's mental difficulties are simply due to the grief of having lost her son in August 1999.

understand that what she was doing was wrong. Not that she didn't know that she was technically lying on the forms, or that she did not understand that she was helping the women for whom she prepared the taxes to lie, but rather that her judgment was impaired so that she understood her actions as helping these women, and thus she had rationalized the lies.[5] Furthermore, the government's vision of Cockett as a sophisticated criminal is weakened by the fact that she hadn't managed to file her own tax returns over this period and her financial gain from this scheme was *de minimis*, since she collected nothing in the vast majority of cases. This is enough evidence to suggest that Cockett had a significantly impaired ability to exercise the power of reason as required by the Sentencing Guidelines. Although the evidence could be read to suggest otherwise, the district court did not commit clear error in this case by departing downward.

## IV

For the reasons given above, we AFFIRM Cockett's sentence.

---

[5]For example, she uniformly put down on every form that these women were "care providers," and stated in her interview with Dr. Jackson "that she helped other people to file for tax refunds because the employment circumstances of those people legitimately entitled them to such refunds." Cockett's history reveals that she was especially sensitive to helping care providers, as she had at many different times in her life been a caretaker, having taken care of her ailing mother, her own children, her brother's three children, and of course, she was a nurse. She believed that she was helping these impoverished mothers and furthermore had expressed to her sister paranoid delusions, stating that she did not trust the government and that "people were brainwashed."

_____

## DISSENT

_____

SUHRHEINRICH, Circuit Judge, dissenting. I do not agree with the majority's conclusion that "it is possible to reconcile the jury verdict with the existence" of Cockett's alleged significantly reduced mental capacity as a matter of law. I also do not agree with the majority's conclusion that the record supports the district court's factual conclusion. I therefore **DISSENT.**

### I.

It is agreed that, at sentencing, the district court cannot rely on a finding that directly conflicts with the jury's verdict. *United States v. Reed*, 264 F.3d 640, 648 (6th Cir. 2001), *cert. denied*, 535 U.S. 962 (2002). In criminal tax fraud cases, the Government must establish that the defendant acted "willfully" at the time of the offense. *Cheek v. United States*, 498 U.S. 192, 200 (1991). Congress decided that, given the proliferation and complexity of the tax laws, a person should not be prosecuted for failing to adhere to a tax law unless the individual knew of the law and consciously disregarded it. *See id.* at 199-200. Thus, the tax laws are an exception to the general rule that ignorance of the law is no defense to criminal prosecution. *Id.* Accordingly, to find Cockett guilty of violating § 7606(2), the jury was required to find that she "willfully" aided and assisted in the preparation of false tax returns. *United States v. Sassak*, 881 F.2d 276, 278 (6th Cir. 1989).

The jury in this case was instructed on the requisite mental state as follows:

"Willfully" means a voluntary, intentional violation of a known legal duty. In other words, to act willfully means to act voluntarily and deliberately with the specific intent to do something the Defendant knew the law prohibited. Willfulness necessarily depends on the

Defendant's state of mind at the time that the acts for which she is charged were committed.  The word "knowingly" also means to act voluntarily and intentionally, and not because of mistake, accident or other innocent reasons.  Accidental, inadvertent or negligent conduct does not constitute willful conduct.

As the majority notes, "[t]he defense theory at trial was that Cockett did not act willfully, having prepared the returns for the women in this case with a good-faith belief that she was not acting in violation of the law." *Maj. Op.* at 6.  In returning guilty verdicts, the jury necessarily rejected Cockett's contention that she did not act willfully at the time of the offenses.  That is, based on the jury instruction, the jury found beyond a reasonable doubt that Cockett acted "voluntarily and deliberately with the specific intent to do something the defendant knew the law prohibited."

Thus, I simply do not see how Cockett's alleged significantly reduced mental capacity, an alleged depressive disorder and thought disorder, "which potentially impaired Cockett's power of reasoning," *Maj. Op.* at 15, can be squared with the jury's finding.  The majority maintains that, "unlike the situation in *Reed*, it is possible to reconcile these two findings."  I cannot discern how the majority *actually* reconciles them, however.  The majority states that the two findings are reconcilable "given their differing scopes of application and the fact that a direct causal link between the sentencing factor and the offense conduct is unnecessary." *Maj. Op.* at 9.  Regarding the "differing scopes of application," the majority acknowledges that "the government would prevail despite the lesser burden of at sentencing, if we assumed that the defense and the mitigating factor were *not* appreciably different." *Maj. Op.* at 11-12.[1]  Yet the majority

---

[1] The majority correctly recognizes that "if a downward departure were available only where Cockett had not acted willfully, there is no question that the judge could not subsequently find by a preponderance of the evidence that Cockett had not acted willfully, since the jury found beyond a reasonable doubt that Cockett acted willfully." *Maj. Op.* at 12.

does not explain in what way the two are appreciably different in this case.  Instead, it simply concludes: "Nevertheless, the government is not correct in concluding that the jury's verdict, finding that Cockett has acted willfully, and the judge's finding of diminished capacity are necessarily in conflict.  In other words, Cockett could voluntarily and intentionally violate the tax laws, but nevertheless be impaired in her ability to exercise the power of reason.  Impairment does not mean total absence of reason."[2] *Maj. Op.* at 12.

Again, the question to my mind is, *but how*?  How can someone allegedly suffering from a significantly reduced mental capacity that purportedly caused her to "not consider herself as a conscious willful lawbreaker," allegedly impaired

---

[2] Nor do I comprehend how the majority's hypothetical concerning a mentally retarded person who knowingly throws a grenade into a neighbor's yard proves their point in Cockett's case.  While it may be illustrative of the general principle that it is possible in certain cases to reconcile a jury verdict with the existence of a significantly reduced mental capacity, I do not see the analogy to this case.  As the Supreme Court recently observed,

> mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial.  Because of their impairments, however, by definition they have they have diminished capacities to understand and process information, to communicate, to abstract mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others.  There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders.  Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability.

*Atkins v. Virginia*, 536 U.S. 304, 318 (2002).  Whatever Cockett's diminished mental capacity, it does not meet the definition of a mentally retarded person or otherwise appear analogous.  I therefore believe the majority's example is an inappropriate illustration of their point that Cockett's alleged cognitive impairment is not inconsistent with the jury's finding of willfulness.

"her ability to both exercise the power of reason and to control her behavior," and prevented her "from understand[ing] that she actually did something wrong," nevertheless "act voluntarily and deliberately with the specific intent to do something [she] knew the law prohibited"? How can someone allegedly suffering from a thought disorder and "intermittent immobilizing depression" have the wherewithall to utilize her training in the business of preparing tax returns, offer to prepare and to actually prepare tax returns for women who earned very little or no income at all, falsely report at Part I of each of the Schedule C-EZs that each taxpayer was a self-employed "care provider," exaggerate or completely fabricate the self-employment income reported at Part II on the Schedule C-EZs, falsely report the false Schedule C-EZ figures on each taxpayer's Form 1040 at the line designated for business income, and then claim Earned Income Credit based on the false income amount in order to obtain a refund, and also back-date several forms to make it appear that they were filled out before the filing deadline? I cannot perceive the majority's formula for reconciliation.

I also do not see how someone whose "image of herself is of a person who helps others, rather than a person who takes advantage of them," asks the majority of these impoverished taxpayers for one-half of the refund they received from the IRS. Nor can I imagine how someone suffering from impaired reasoning and immobilizing depression is capable of writing letters to the IRS inquiring into the status of the refunds, and concealing her involvement by failing to enter her name as the tax preparer in the designated section of the 1040 form and by failing to sign her name on the letters.

In further support of its conclusion, the majority also reasons that a direct causal link between the sentencing factors and the offense conduct is unnecessary. In support, it relies on *United States v. Sadolsky*, 234 F.3d 938 (6th Cir. 2000), which I authored. However, the significantly reduced mental capacity at issue in *Sadolsky* was a volitional disorder, namely a gambling disorder. With volitional disorders, the defendant has a "significantly impaired ability to . . .

(B) control behavior that the defendant knows is wrongful." U.S.S.G. § 5K2.13, cmt. (n.1). In *Sadolsky*, the Government argued that the defendant's gambling problem would only justify a downward departure if he had been arrested for gambling, rather than fraud. Specifically, the Government contended that "'the question [was] whether this new volitional test requires that the defendant be unable to control the behavior that *constitutes* the crime, or whether it can be satisfied by an inability to control behavior that provides the *motive* for the crime.'" *Sadolsky*, 234 F.3d at 942-43. In rejecting the Government's argument, we explained:

> The Guideline language does not support the Government's argument. Section 5K2.13 does not distinguish between SRMCs [significantly reduced mental capacity(s)] that explain the behavior that *constituted* the crime charged and SRMCs that explain the behavior that *motivated* the crime. In other words, § 5K2.13 does not require a direct causal link between the SMRC and the crime charged. . . . Thus, because Sadolsky's gambling disorder is a likely cause for his criminal behavior [credit card fraud to obtain cash], given that he had already "maxed out" his own credit line before resorting to fraud, the two-point reduction is not inconsistent with the guideline provision.

*Id.* at 943 (footnote omitted).

Because *Sadolsky* dealt with a volitional impairment–i.e. the defendant suffered from a lack of impulse control over behavior "the defendant *knows* is wrongful," it is not dispositive in a case where the potential conflict is between the specific intent element of a crime and a *cognitive* impairment. Thus, the statement in *Sadolsky* that a direct causal link between the conduct that caused the crime and the behavior that motivated the crime should not be read out of context, because volitional and cognitive impairments are obviously not analogous. Furthermore, the majority has not even shown an *indirect* causal link. Having said this, I do not mean to suggest that cognitive impairments can never be

squared with specific intent crimes. However, I simply do not see how they can be reconciled in this case.

## II.

In addition to requiring an actual cognitive impairment, § 5K2.13 requires that "[i]f a departure is warranted, the extent of the departure should reflect the extent to which the reduced mental capacity *contributed to* the commission of the offense." U.S.S.G. § 5K2.13 (emphasis added). The district court made the following fact findings:

And this case is fraught with special circumstances.

First of all, there's nothing in the guidelines that takes into account 54 or 53 or 55 years of lawful conduct. Secondly, in my short tenure on the bench, almost three years I have not seen an individual in the same emotional state as Mrs. Cockett. And I'm not referring to the last ten or 15 minutes. I am referring to the trauma that has been visited upon her in her lifetime, which from the information I have, has never been properly addressed through grief counselling [sic] or the like. And that includes being stabbed approximately 26 times by her former husband. That includes living through the murder of her son.

We have had testimony in the nature of diminished capacity at trial, as well as reports in the nature of competency at trial, as well as reports in the nature of competency for trial, examination reports. And as the record will reflect, there have been times when this case could not proceed because of her mental condition, which was sufficiently impaired so that she could not understand the nature of the proceedings and/or aid her counsel.

It troubles me somewhat that the Government has taken the position that the guidelines are the last step in this case, or if that's a mischaracterization, then that there's no reason for a downward departure in this

particular case. I won't do the easy thing, which would be to do a ten- or 15-second sound bite about the conduct of Mrs. Cockett compared to some other taxpayers who are not prosecuted to the full extent of the law. Nor will I dwell on the guideline provisions that – or the Government's argument that seem to encourage higher sentences for people who exercise their constitutional right to go to trial. But I do find that there is a basis –

. . . I find, given the extraordinary facts, that there is a basis for downward departure based on 5K2.13, which states the sentence below the applicable guideline range may be warranted if the Defendant committed the offense while suffering from a significantly reduced mental capacity. And then they have three exceptions to that rule, none of which apply here. Then the last sentence says, "If a departure is warranted, the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense."

And it's the sentence of this Court on Counts 2 through 22 of the indictment, pursuant to the Sentencing Reform Act of 1984, the Defendant is hereby placed on probation for a period of two years, all to be served concurrently. I'm instructing that a condition of that probation is continued mental health counselling [sic] with an emphasis, although belatedly, on grief counselling [sic].

Mrs. Cockett, your life of 56 years has had substantially more than your share of grief. From the reports that I have read, I have not seen until very recently any attempt by any professional to help you. That requires that you cooperate. And now you have no choice, because it's a condition of probation.

In my view, these fact findings do not support a conclusion that Cockett has an alleged diminished mental capacity which contributed to the offenses. As detailed above, the nature of the scheme here required a fair amount of mental acumen, which belies any finding that any purported reduced mental

capacity was present at the time of the offenses. *See United States v. Johnson*, 979 F.2d 396, 401 (6th Cir. 1991) (holding that the district court erred in departing under Section 5K2.13 based on a diagnosed severe adjustment disorder because there was no indication that the defendant was unable to process information or to reason; stating that "[t]o the contrary, from all accounts, defendant displayed considerable mental agility in his professional and personal affairs, both legal and illicit"); *United States v. Goossens*, 84 F.3d 697, 701 (4th Cir. 1996) (holding that the district court erred in departing on the grounds that the defendant suffered from generalized anxiety disorder because most of the evidence presented to the district court indicated a high level of mental functioning on his part, including the fact that the defendant encrypted the pornographic material on his computer to avoid detection).

Furthermore, the Government introduced evidence at trial regarding Cockett's mental state at the time of the offenses. Several of Cockett's tax clients testified that she was intelligent and acted normally. Cockett impressed the Internal Revenue Service Agent who interviewed her on August 18, 1998, as being intelligent, professional, and knowledgeable about tax law. Cockett's activities during the time frame of the offenses also undermine any claim that she was operating under a reduced mental capacity. While preparing the fraudulent returns, Cockett was working as a nurse at a medical center. Cockett's supervisor testified that she properly performed her duties as a nurse during 1997 and 1998. *Cf. Johnson*, 979 F.2d at 401 (finding that the letters attesting to the defendant's upstanding qualities and seeming "normality" undermined any contention that his psychological infirmity was significant). Cockett's supervisor also testified that Cockett did not display signs of depression until August, 1999, when her son was killed. Thus, the evidence indicates that any mental impairments did not arise until *after* the commission of the tax offenses in 1997 and 1998. Any mental capacity therefore could not have "contributed to" the commission of the offenses.

The district court also focused on the abusive treatment by Cockett's ex-husband as a basis for concluding that she suffered from a reduced mental capacity. This treatment by her ex-husband occurred in the late 1960s, nearly thirty years *prior* to the offenses. I have a difficult time seeing how events that occurred so many years in the past can be linked to the crime at issue.

The district court also referenced "the nature of diminished capacity at trial, as well as reports in the nature of competency for trial." The district court was referring to the testimony of Dr. Jackson, a forensic psychologist appointed by the court. At trial, Jackson testified that he believed Cockett had been suffering from a mood and thought disorder in the 1990s. However, he also testified that he had not drawn a definite conclusion in that regard. Prior to sentencing, Jackson submitted a letter, which contrary to his testimony, concluded that at the time of the offenses, "she was experiencing ongoing symptoms of impairment in her ability both to exercise the power of reason and to control her behavior. Thus, it is my opinion that she did so while suffering a significantly reduced mental capacity."[3]

In my view, the district court erred in relying on Jackson's (or Abramsky's) opinion in departing downward. Jackson's opinion at trial was not certain and was based upon only four hours of examination, two to three years after the offenses in question. Moreover, the examinations were conducted after Cockett had been indicted, when she had an incentive to exaggerate or fabricate her condition. *See United States v. Soliman*, 954 F.2d 1012, 1214 (5th Cir. 1992) (holding that

---

[3] Although the district court did not explicitly refer to it, Mr. Michael Abramsky, a psychologist, also submitted a letter to the district court at sentencing. Abramsky wrote that, based on her self-report, Cockett "it appears that this woman has suffered from intermitted immobilizing depressions over the last fifteen years" and "continues to be as baffled as before, never comprehending that she actually did something wrong." Cockett did not begin seeing Abramsky until April 5, 2000, about a week after she was indicted.

the court was not bound by definition of "significantly reduced mental capacity" provided by testifying psychologist and psychiatrist where the court specifically found that the mental condition described by the defendant's expert witnesses as depression did not contribute to the commission of the crime). Jackson's post-trial letter conflicts with his testimony at trial. At trial, Jackson could not determine with certainty Cockett's state of mind at the time of the offenses. Jackson did not evaluate Cockett between trial and sentencing. Therefore, his revised conclusion is inexplicable. Similarly, Abramsky concluded merely that, during her treatment, she was unable to understand the wrongfulness of her behavior post-indictment. Abramsky stated that, based on the history Cockett provided, it appeared that she had suffered from intermittent immobilizing depressions over the last fifteen years. He did not express an opinion as to her state of mind at the time of the offense. Thus, any reliance by the district court on Abramsky's letter is misplaced.

The majority also relies on the results of the Minnesota Multiphasic Personality Test administered by Jackson. This test was administered on April 11 and April 17, 2000, two to three years after the offenses at issue and after her son's death. In his letter dated April 18, 2000, Jackson stated that he conducted the test "[i]n order to further clarify Mrs. Cockett's *current* functioning" as part of his evaluation of whether Cockett was then competent to stand trial. (J.A. 614) (Emphasis added.) Although the majority links the results of this test to Jackson's opinion in later reports regarding Cockett's diminished capacity at the time of the offenses, the psychologist himself did not make this connection until post trial, and in contradiction with his trial testimony. Thus, I think it is disingenuous for the majority to state that the results of the MMPT support a conclusion that Cockett's purported depressive disorder and thinking disorder "is explicitly linked to a diminished capacity to reason *during the relevant time period.*" *Maj. Op.* at 16. Moreover, it is equally likely that the intervening trauma of her son's death affected the MMPT result.

Based on its remarks at sentencing, it is apparent that the district court fashioned Cockett's sentence based on its sympathy for Cockett rather than the evidence presented at trial.[4] Cockett's fifty-some years of lawful conduct is not a

------

[4] At the sentencing hearing, the district court rejected the Government's argument that the "key inquiry" was whether Cockett was suffering from a diminished mental capacity at the time of the offense.

THE COURT: Isn't the key inquiry here what is an appropriate sentence for somebody with her background, her age, her involvement and the lack of sophistication of this whole scheme?

I mean, if I were to turn my back and forget everything I heard at trial, I would think you were talking about a tax protester or a large dollar amount. You have expended an enormous amount of energy writing a wonderful brief as to all of the points that you have just raised. And now you have repeated them in court just in case I didn't understand your wonderful brief. But we're not faced with a multiple repeat offender. We're not faced with somebody who has systematically raided the treasury or attempted to raid the treasury in a large way. We're talking about somebody who was involved with all of these counts with less than $23,500, which is–should be taken into consideration somewhere in the line.

I mean, it's wonderful that the Internal Revenue Service was able to prevent the loss. And it's terrible that Mrs. Cockett attempted to defraud the IRS. Those are givens. Now, we are faced with a human being. And it troubles me a little bit that the bigger effort that you are putting into this case would indicate that this somehow–the conduct of Mrs. Cockett somehow was a threat to the treasury of the United States.

MS. COHEN: In response, Your Honor, the Government submits that the guidelines, sentencing guidelines themselves take into consideration the amount of loss in this case. The guideline range is simply 15 to 21 months, and that guideline range takes into account the amount of loss to the IRS.

The comments that the Court has made may be taken into consideration in determining whether her guideline range should be at the bottom, middle or top of that guideline range. The Government simply submits that Defense, the Defense counsel

special circumstance, and the Sentencing Guidelines factor in a defendant's lack of a criminal record via the criminal history categories. Furthermore, the district court's obvious compassion for the unfortunate events of Cockett's life is not a substitute for a specific finding that she was suffering a cognitive impairment at the time of the offenses. This Court has emphasized that emotional hardship, alone, cannot support a § 5K2.13 departure. "[W]e think it 'ill-advised' to excuse a defendant's unlawful conduct merely because he has suffered insult or hardship . . . . Such a ruling would entitle

---

has not submitted any reasons that legally justify a downward departure or any other sentence outside of the applicable guideline range, which is 15 to 21 months.

From the foregoing colloquy it appears that the district court misunderstood both the purpose and functioning of the Guidelines, despite the Government's clear explanations in its brief and at argument. As the Policy Statement of the Sentencing Reform Act of 1984 explains, "the Act's basic objective was to enhance the ability of the criminal justice system to combat crime through an effective, fair sentencing system." United States Sentencing Commission, *Guidelines Manual*, Ch. 3, Pt.A, intro. To achieve this goal, Congress sought honesty in sentencing. Furthermore, it "sought reasonable uniformity in sentencing by narrowing the wide disparity in sentences imposed for similar criminal offenses committed by similar offenders." *Id.* And, Congress "sought proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of differing severity." *Id.* As the Government pointed out at the sentencing hearing, the guidelines achieve these goals through a sentencing scheme that takes into account both the amount of loss, and the defendant's relative lack of criminal experience.

It further appears that the district judge perceived that his personal views and sympathies were appropriately factored into the departure calculus. They were not. *See United States v. Pullen*, 89 F.3d 368, 371 (7th Cir. 1996) (stating that the goal of the Sentencing Reform Act "is to place federal sentencing on an objective, uniform, and rational (or at least articulable, nonintuitive) basis" and to do away with pre-guidelines discretionary sentencing). And I would submit that, albeit a relatively "small" financial loss to the United States Treasury, it is still fraud on the United States Government and the citizens of this country. The district judge and I may see the matter differently; but again the Sentencing Guidelines remove such a philosophical debate from the sentencing calculus.

virtually every defendant to a downward departure, since an inescapable aspect of human existence is misfortune or defeat." *Johnson*, 979 F.2d at 401; *see also United States v. Dyer*, 216 F.3d 568, 571 (7th Cir. 2000) (stating that reducing a defendant's sentence pursuant to § 5K2.13 because the court feels sorry for the defendant is "just the kind of *ad hoc* unfocused sentencing judgment that the guidelines seek to purge"); *United States v. Withers*, 100 F.3d 1142, 1147-48 (4th Cir. 1996) (noting that the Guidelines instruct that mental and emotional conditions are not ordinally relevant, thus to qualify for a departure, the defendant must be suffering from something greater than emotional problems or hardship; otherwise "anyone who could point to a sufficiently tragic event in his or her life would be eligible for a sentence reduction"); *United States v. Pullen*, 89 F.3d 368, 369-71 (7th Cir. 1996) (affirming the district court's refusal to depart downward where the defendant had suffered physical and emotional abuse and a psychologist testified that the defendant suffered from a schizoid disorder that impaired his ability to think and act clearly because "[i]f a miserable family history were . . . a permissible basis for leniency . . . this would resurrect the pre-guidelines regime of discretionary sentencing"). In essence, as the Government observes, "[t]he district court's comments at sentencing reveal that it simply applied a thin glaze of . . . questionable and inapplicable expert opinion to tragic events in defendant's life in order to justify a finding of cognitive impairment." The Sentencing Guidelines do not allow this, however.

For the foregoing reasons, I therefore respectfully **DISSENT.**